FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,

v.

Caspar W. WEINBERGER, et al., Defendants.

Civ. A. No. 84–3542.

United States District Court, District of Columbia.

May 31, 1985.

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Gary B. Randall, Atty., Dept. of Justice, Land & Natural Resources Div., General Litigation Section, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

The plaintiffs, a self styled public interest organization joined by several concerned citizens,[1] seek to enjoin the con-

---

1. Plaintiff Foundation on Economic Trends is a private, nonprofit organization incorporated in the District of Columbia and "actively involved in analyses of political, economic, social, environmental, ethical, and philosophical implica-

tion[s] of all forms of biological and genetic engineering." Plaintiffs' Complaint ¶ 1.

Plaintiff Jeremy Rifkin is the President of the Foundation on Economic Trends.

Plaintiff Gene R. La Rocque is a retired Admiral in the Navy who maintains "a long standing

struction of a proposed "Aerosol Test Facility" and proposed "Toxic Agent Test Support Facilities" at the Department of the Army's Dugway Proving Ground in Dugway, Utah. The plaintiffs contend that the defendants have failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347 (1976 and Supp. V, 1981), its implementing orders and regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 500–706 (1982). Specifically, the plaintiffs argue that the defendants have violated NEPA by failing to prepare and publicly circulate a detailed environmental impact statement (EIS). The defendants, in turn, contend that an EIS was not required under the circumstances because the Army made a legally adequate and factually supported finding of "no significant [environmental] impact."

For the reasons set forth below, the Court concludes that the defendants' Finding of No Significant Impact and accompanying Environmental Assessment do not meet the carefully delineated standards of review established by this Circuit. Accordingly, the plaintiffs' request for permanent injunctive relief is granted, with modifications.

I. *Factual Background and Parties' Contentions*

A.

The Dugway Proving Ground, located 87 miles southwest of Salt Lake City, Utah, is a Department of Defense (DOD) installation that is operated by the United States Army. The primary purpose of the Dug-

way installation is to test and assess the "military value of chemical warfare and biological defense systems." Defendants' Memorandum at 4.

Dugway was officially established as a test facility by President Franklin Delano Roosevelt in 1942. The first biological facilities were built in 1943. Since that time, Dugway has grown from approximately 126,000 acres in size to approximately 840,000 acres. The facility is flanked by the 22,000-acre Utah Test and Training Center, and by substantial open lands held under the control of the Bureau of Land Management. Currently the installation contains a variety of chemical and biological testing laboratories, as well as extensive support and storage facilities.

During the 1970s, parts of the Dugway facility fell into disuse and disrepair. The deterioration of the installation was the direct result of executive decision, made at the highest level of government, to "de-emphasize" the use of chemical and biological warfare in possible future armed conflicts.[2] Reduced funding left Dugway operating only at "minimum core capability" for biological defense testing. Plaintiffs' Mem. at 3.

Beginning in 1983, however, the government expressed new concerns over alleged violations by the Soviet Union of the 1972 Convention. Convinced that "the Soviet Union has maintained its offensive biological warfare program and that it is exploring genetic engineering to expand [the]

interest in and involvement with weapons systems, military spending and policies ... on foreign policy and world peace." Plaintiffs' Complaint ¶ 4. Rear Admiral La Rocque is currently the Director of the Center for Defense Information.

Plaintiff William T. Fairbourn, a resident of Salt Lake City, Utah, is a retired Marine Corps Major General who lives "downwind" of the Dugway Proving Ground.

**2.** On November 25, 1969, President Nixon renounced the use of lethal biological agents as weapons and declared as a matter of policy that the United States would not initiate the use of chemical warfare in armed conflicts.

In 1972, the United States and the Soviet Union became signatories to the Convention on the Prohibition of the Development, Production and Stockpiling of Bacterial (Biological) and Toxin Weapons and on Their Destruction, United States Treaties, 26, Part I (1975), 583–592, TIAS No. 8062, which outlawed the development, production, or stockpiling of microbial or biological weaponry. The Convention, however, continued to allow the production and possession of biological agents and toxins in quantities needed for prophylactic, protective, or other peaceful purposes.

program's scope",[3] the Department of Defense in 1984 sought Congressional approval for the "reprogramming" of $8.4 million in previously appropriated military construction funds to renovate and expand the facilities at Dugway. *See* letter of Nov. 20, 1984, Caspar W. Weinberger (Secretary of Defense) to James R. Sasser (U.S. Senator and Ranking Minority Member, Subcommittee on Military Construction, Committee on Appropriations), App. to Plaintiff's Mem. Of the $8.4 million, $1.4 million was requested for the construction of a new Aerosol Toxin Test Laboratory, and the remainder for the construction of Toxic Agent Test Support Facilities.

According to the Department of Defense, the purpose of the Dugway modernization would not be to develop offensive biological weaponry, but merely to "develop and field adequate biological and toxin protection":

> The Department of Defense has directed the modernization of Dugway Proving Ground to be able to test adequately whether our military equipment meets the threats posed by Soviet chemical and biological warfare capabilities.
>
> . . . .
>
> Our development efforts in this area are driven by the Soviet threat. To ensure that our protective systems work, we must challenge them with known or suspected Soviet agents. We have the capability to do this with many chemical agents; however, the unique characteristics of biologicals require an even higher level of containment. Currently we do not have a test chamber large enough to hold and thus challenge realistically our protective items, such as detectors, filters, etc., with biologicals and toxins. The Dugway Proving Ground facilities are designed to meet this need.

Congress has not only consistently supported the development of biological, toxin, and chemical protective capabilities, but has often directed or encouraged the Department to do more in this area. Such support has included directly that nuclear, biological, and chemical (NBC) protection be provided for combat vehicles; approving research laboratories; and appropriating funds for the development and acquisition of NBC protective materiel. Dugway is the principal test facility for this materiel.

Letter of Nov. 20, 1984, Caspar W. Weinberger to Senator Sasser, App. to Plaintiffs' Mem.

The specifics of the DOD's modernization plan called for the construction of the new Aerosol Toxin Laboratory within an existing structure at a complex known at Dugway as the "Baker Laboratory". The proposed toxic agent support facilities were to be located eight miles from the Baker Laboratory. These facilities were not intended to support or service the Aerosol Toxin Laboratory.

The Aerosol Toxin Laboratory was designed to meet the most stringent government safety standards. Because the Army expected "at some future date Dugway [might] be required to test materials that have been genetically altered," DOD planned the Laboratory as a "Biosafety Level 4" or "BL 4" facility. Declaration of Amoretta M. Hoeber, ¶ 8; Environmental Assessment at 1–3. That classification meant simply that the laboratory would satisfy the National Institutes of Health [Safety] Guidelines for Research Involving Recombinant DNA Molecules. *See* 48 Fed. Reg. 24556, 24571 (June 1, 1983), *amended* at 49 Fed.Reg. 46226, 46282 (Nov. 23,

---

**3.** The term "genetic engineering" refers to the scientific process of cloning genetic material (DNA) from one organism and inserting it into another in an effort "to control ... the fundamental processes of life and evolution." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143 at 147 (D.C.Cir.1985). The result is generally known as "recombinant DNA."

As this Circuit noted in *Foundation on Economic Trends,* "[b]road claims are made about both the potential benefits and the potential hazards of genetically engineered organisms. Use of recombinant DNA may lead to welcome advances in such areas as food production and disease control. At the same time, however, the environmental consequences of dispersion of genetically engineered organisms are far from clear." *Id.* at 147.

1984). Only four such "BL 4" facilities currently exist in the United States,[4] and none existed at Dugway when the proposal was submitted to Congress.[5]

According to the Army's plans, the new laboratory would have an aerosol chamber area of 400 square feet, and a total size of 1408 square feet. Safety features were designed to include pressurized air locks, a biowaste sterilization system, highly sophisticated air exhaust filtration systems, and pressurized suits with separate air supplies for personnel.

In August 1984, DOD's request for reallocation of the $8.4 million was summarily approved as part of a larger $66 million "reprogramming" request. The funding requests were reviewed only by the chairman and ranking minority member of the Subcommittee on Military Construction. In accordance with 10 U.S.C. § 2804, the requests were approved without a formal vote, hearing, or debate.

As required by law, the Army promptly prepared a Record of Environmental Consideration containing an Environmental Assessment, a Finding of No Significant Impact, comments submitted by interested parties on the Environmental Assessment, and the Army's own review and response to the comments submitted on the Environmental Assessment. The Environmental Assessment concluded that the proposed activity "should cause no significant impact on the quality of the human environment." Environmental Assessment at 12. That conclusion was based largely on the Army's own assertion that the new maximum containment laboratory would not be used to conduct testing experiments that differed in any significant manner from the experimentation currently being carried out at Dugway's BL 2 and BL 3 laboratories:

Work in such a [proposed BL4] laboratory would involve the 'conventional' threat agents.... None of these threat agents absolutely require BL 4 containment.

....

No pathogenic [disease producing] fungi have been used in the present facility for years; no use at DPG [Dugway Proving Ground] is projected. No recombinant DNA or "genetic engineering" work has been done, and none is projected.

Environmental Assessment at 1, 2. The central reason for building the new facility, the Army insisted, was to provide an "added margin of safety":

[E]xpertise and facilities exist for testing with biological aerosols of pathogenic and nonpathogenic (simulant) microorganisms at the Biosafety Level (BL) 2 and BL 3.... However, much of the equipment and all of the facilities are over 30 years old. Frequent failures of the utility systems occur. Those involving the air and water systems have led to costly losses of instruments and tests, laboratory downtime and need for repairs. Although safety of personnel and the environment is not being compromised even under the current conditions, new equipment and instruments, and a BL 4 facility with modern features, would improve safety by providing state-of-the-art facilities and the latest in containment equipment, especially for tests with aerosols of pathogens in a chamber, and avoid the problems caused by the current inadequate building.

Environmental Assessment at 1. As designed, the proposed aerosol facility posed no significant environmental hazard because, the Army pointed out, similar containment facilities had been built and run with success in other parts of the country.

4. The other facilities are operated by the National Institutes of Health, the National Institute for Allergic and Infectious Diseases, the Center for Disease Control, and the Army Medical Research and Development Command.

5. The facilities at Dugway at present are designed to meet National Institutes of Health "BL 2" and "BL 3" containment standards. As such, they are not equipped to handle research involving recombinant DNA, or the most pathogenic of toxins.

In the event that Dugway was "tasked" in the future to test more dangerous "threat agents", due attention would be given at that time to "the appropriate NEPA process". Environmental Assessment at 1, 3. In the meantime, the Army reasoned, immediate construction of a BL 4 facility would avoid a potentially "devastating" delay should the intelligence community decide at some point in the future that defensive testing with "nonconventional" biological agents was required to meet the Soviet threat. Environmental Assessment at 1.

In December, 1984, one month before the Army submitted its Environmental Assessment and Finding of No Significant Impact, the plaintiffs filed a motion for preliminary injunction to enjoin construction of the proposed aerosol laboratory until NEPA's procedural requirements were met. The plaintiffs contended that the Army was required to "prepare an environmental impact statement under NEPA Section 102(2)(C), 42 U.S.C. § 4332(2)(C) or an environmental assessment as defined in the NEPA regulations [40 C.F.R. § 1508.9]."

One month later, in January, 1985, the parties agreed to postpone further briefings and oral argument indefinitely pending the completion of the defendants' Record of Environmental Consideration. On February 4, 1985, the defendants provided the plaintiffs with a copy of the Environmental Assessment and Finding of No Significant Impact. Shortly thereafter the parties agreed, and the Court so ordered, that the plaintiffs would move promptly for a permanent injunction, with a full evidentiary hearing to be held before the Court on April 26, 1985. The defendants further agreed at that time to delay the opening of bids on the proposed laboratory construction project until June 1, 1985.[6]

## B.

The plaintiffs' challenge to the Army's action, as set out in the briefs, developed in the evidence and argued at the hearing, is premised on three main contentions. First, the plaintiffs contend that, contrary to the Army's disclaimers, the construction of the new Aerosol Toxin Laboratory will result in a significant change in the type of testing conducted at Dugway for which an EIS must be prepared. The plaintiffs point out that by the defendants' own admission, Dugway's purpose is "to test military equipment to insure it meets the threats posed by Soviet chemical and biological capabilities." Given DOD's stated belief that "the Soviet Union ... is exploring genetic engineering to expand [its biological warfare] program's scope," it is inevitable, the plaintiffs argue, that recombinant DNA research will be performed at the new laboratory to "meet the Soviet threat."

According to the plaintiffs, it defies common sense to believe that the Army would build a new high containment facility—only the fifth of its kind in the country—were it not intending to use that facility for more advanced, and more dangerous research than that currently being performed at Dugway. Indeed, by the Army's own assessment, the "safety of personnel and environment is not being compromised ... with the current laboratory facility." Finding of No Significant Impact at 1. Little incentive exists to construct a new laboratory, therefore, unless the intention is to perform experiments involving toxins and agents requiring a different biosafety level. The Army's failure to analyze and discuss the potential environmental hazards associated with recombinant DNA research is, by itself, the plaintiffs conclude, sufficient to justify an injunctive order requiring the preparation of an EIS. *See e.g., Founda-*

6. In their request for permanent injunctive relief, the plaintiffs challenge only the proposed construction of facilities serving the Aerosol Toxin Laboratory or facilities so "interrelated" to it that their "efficiency" is dependent on the Aerosol Toxin Laboratory. Because the defendants have asserted, by affidavit, that the support facilities are not "interrelated" to the Aerosol Toxin Laboratory, Defendants' Mem. at 8, Declaration of David Nydam, ¶ 9, and because that assertion is not refuted by the plaintiffs, the Court concludes that the nine Toxic Test Support Facility buildings are not in issue. The sole issue involved in this case, therefore, concerns the construction of the proposed Aerosol Toxin Laboratory.

*tion on Economic Trends v. Heckler,* 756 F.2d 143 (D.C.Cir.1985) (requiring agency to prepare a new environmental assessment addressing the environmental problems associated with recombinant DNA experimentation and research).

The plaintiffs' next contention overlaps with the first, but is directed primarily at other alleged "failings" in the Army's Record of Environmental Consideration. Having argued initially that the defendants' failure to address the issue of recombinant DNA research *"per se"* requires the preparation of an EIS, the plaintiffs' second argument challenges directly the legal and analytical adequacy of the considerations that *were* addressed in the Environmental Assessment. Specifically, the plaintiffs contend that the Army's Environmental Assessment is inadequate because it fails to take the requisite "hard look" at the potential environmental problems involved in pathogenic toxin aerosol research, and fails to identify "the relevant areas of environmental concern." *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678 (D.C.Cir.1982). The plaintiffs maintain that the Assessment does not adequately discuss the possible alternatives to the proposed action, the need for biological (as opposed to physical) containment, the dangers involved in the use of aerosols, the need for the facility, and the possible "worstcase" situations that might develop were an accident to occur.

Third and finally, the plaintiffs insist that under the Supreme Court's recent opinion in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Army's use of reprogrammed funds is unconstitutional. This claim was not raised in the plaintiffs' complaint. The plaintiffs moved to amend the complaint to include the claim almost immediately prior to the April 26, 1985 hearing. The Court concluded at the hearing, and so notified the parties, that the new claim exceeded the scope of the issues the parties had agreed to brief for the April 26, 1985 hearing and that they were prepared to present and argue that date. Accordingly, the amendment incorporating this claim was not permitted.

The first two claims raised by the plaintiffs, however, are ripe for decision. It is to these issues that the Court now turns.

## II. Statutory Background and Standard of Review

### A.

"Recognizing the profound impact of man's activity on the interrelations of all components of the natural environment," 42 U.S.C. § 4331(a), the 91st Congress enacted NEPA

> to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation.

42 U.S.C. § 4321. At heart, NEPA is a procedural statute, *Stryckers Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1979), "designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271 (7th Cir.1983); *Andrus v. Sierra Club,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1978). To achieve this end, section 102(2)(C) of the Act, 42 U.S.C. § 4332(2)(C), requires that "to the fullest extent possible" all federal agencies shall

> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The thrust of this section, the Supreme Court has noted, is twofold: "to inject environmental considerations into the federal agency's decisionmaking process by requiring the agency to prepare an EIS," and "to inform the public that the agency has considered environmental concerns in its decisionmaking process." *Weinberger v. Catholic Action of Hawaii,* 454 U.S. 139, 143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). The required EIS, in the Court's words, is the "outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Id.* Disclosure of an EIS does not "necessarily dictate any substantive outcome," *Morris,* 714 F.2d at 274–75; rather, it simply makes the public "aware that the agency has taken environmental considerations into account." *Catholic Action,* 454 U.S. at 143, 102 S.Ct. at 201; *see Baltimore Gas & Electric Co. v. National Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).

■ Under NEPA, the administrative agency has the " 'initial and primary responsibility' to ascertain whether an EIS is required." *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d at 681, *quoting Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1002 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). Because section 102(2)(C) requires the preparation of an EIS for a major federal action only if that

action "significantly affects the quality of the human environment," 42 U.S.C. § 4332(2)(C), a finding by an agency that the proposed action will produce "no significant impact" on the environment relieves the agency of its obligation to prepare an impact statement. An agency, however, cannot satisfy its responsibility under the Act by merely issuing a "conclusory statement" that the action does not significantly affect the environment. *Foundation on Economic Trends,* at 146. Rather, unless the "major federal action" falls within a "categorical exclusion," 40 C.F.R. § 1508.4 (1983), the agency must "support each finding of 'no significant impact' with a 'concise public document' " generally referred to as an environmental assessment. *Foundation on Economic Trends,* at 147 *quoting* 40 C.F.R. §§ 1501.4(a)–(b), 1508.9. More specifically, the environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1508.9(1).[7]

■ Although an environmental assessment need not be as elaborate and detailed a document as an EIS, the agency must still undertake a "comprehensive assessment of the expected effects of a proposed action" in order to determine if that action is "significant". *Lower Alloways Creek Tp. v. Public Service Elec.,* 687 F.2d 732, 740 (3d Cir.1982). Among the factors to be considered in evaluating the "significance" of the federal action are: the degree to which the proposed action affects public health or safety; the unique geographical characteristics of the surrounding area; the potential for controversy; the possibility of unknown risks; and the potential effect on endangered species. 40 C.F.R. § 1508.27 (1983).[8] Further, when

---

7. "As a screening device, the environmental assessment allows agencies with limited resources to focus on truly important federal actions." *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir.1982).

8. 42 C.F.R. § 1508.27 defines "significantly", in full, as follows:

" 'Significantly' as used in NEPA requires considerations of both context and intensity:

"(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For in-

weighing these factors the agency must take into account both the long- and short-term consequences of the action for society as a whole and for the local region, and consider the "intensity" or severity of the impact. *Id.; see Lower Alloways*, 687 F.2d at 740.

### B.

█ The agency finding made in an environmental assessment—whether it be a finding of no significant impact or a finding of significant impact—is subject to judicial review. As a general matter, in this situation "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Electric*, 462 U.S. at 97–98, 103 S.Ct. at 2252–53; *Foundation on Economic Trends*, at 151; *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983); *Cabinet Mountains*, 685 F.2d 678, 681 (D.C.Cir. 1979).

█ When reviewing the decision reached in an environmental assessment, the Court must determine whether the agency has provided "convincing reasons why potential impacts are truly insignificant." *Maryland-National Capital Park and Planning Comm'n v. United States Postal Service*, 487 F.2d 1029, 1040 (D.C. Cir.1973). This Circuit has employed a four-part test to examine a finding of "no significant impact". The Court must determine:

(1) whether the agency took a "hard look" at the problem;

(2) whether the agency identified the relevant areas of environmental concern;

(3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and

(4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum.

*Sierra Club*, 717 F.2d at 1413; *Cabinet Mountains*, 685 F.2d at 681–82. At bottom, review of an agency decision to forego preparation of an EIS, and the application of the four-factor test, must be undertaken with a view merely to determine if the agency has taken the "hard look" at the

stance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

"(b) *Intensity*. This refers to the severity of impact.

Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

"(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

"(2) The degree to which the proposed action affects public health or safety.

"(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

"(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

"(5) The degree to which the possible effect on the human environment are highly uncertain or involve unique or unknown risks.

"(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

"(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

"(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

"(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

"(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."

environmental consequences of the action that NEPA requires. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Foundation on Economic Trends*, at 151; *Sierra Club*, 717 F.2d at 1413.

### III. *Adequacy of The Environmental Assessment*

#### A.

The plaintiffs' central contention focuses on the nature of the federal action they believe the Army has proposed. In the plaintiffs' view, the Army has proposed the construction of a facility that will, inevitably, be used to conduct tests involving genetic engineering. Recombinant DNA research, the plaintiffs insist, is precisely the type of "new and expanding technological advances" that so concerned the drafters of NEPA. *Foundation on Economic Trends*, at 147. Failure even to address the potential dangers of recombinant DNA testing at Dugway, the plaintiffs conclude, should constitute sufficient grounds on its own to require preparation of an EIS.

The precise scope of the proposed action was strenuously contested at the April 26, 1985 hearing. To support their contention that the Army is "disingenuously attempting to suggest that there is no new program involved for [the] ... aerosol laboratory," Plaintiffs' Reply Mem. at 2, the plaintiffs cited statements made by Army representatives before Congress, and in the Environmental Assessment itself, affirming the Army's intent to do whatever testing is necessary to meet the "Soviet biothreat". Specifically, the plaintiffs pointed to: comments made by Amoretta M. Hoeber, Principal Deputy Assistant of the Army for Research, Development and Acquisition, that "the Soviets are actively engaged in research and development of toxins as weapons", Declaration of Amoretta M. Hoeber at 2; Secretary Weinberger's Letter of Nov. 20, 1984 to Senator Sasser noting that the Soviets are "exploring genetic engineering" and that the Dugway facility is needed to "meet[ ] the threats posed by Soviet chemical and biological warfare capabilities"; statements made in an Army "Fact Sheet" submitted to Congress in support of the funding request noting that "in the area of chemical and biological defense, DPG [Dugway Proving Ground] has the mission to test military equipment to insure it meets the threats posed by Soviet ... biological capabilities," and that the aerosol test facility will "allow for defensive studies of these biologicals which cannot be studied safely at a lower [BL 3 or BL 2] containment level"; and statements in the Environmental Assessment to the effect that (1) the bioagents used at the new facility "could involve laboratory operations that require the use of BL 4 containment", Environmental Assessment at 1; (2) that "without this project, it may be more difficult or impossible to ... conduct tests with pathogens requiring containment more stringent than provided by BL 3", Environmental Assessment at 2; and (3) if an existing facility were to be used to perform the projected work of the new facility, "another BL 4 laboratory would have to assume the DPG workload." Environmental Assessment at 10.

The defendants responded by expressly denying that the proposed action involved any change in the Dugway testing program. In support of their position they pointed to statements in the Environmental Assessment asserting that "[n]o pathogenic findings have been used in the present facility for years; no use at DPG is projected. No recombinant DNA or 'genetic engineering' work has been done, and none is projected," Environmental Assessment at 2, as well as affidavits of Army officials disavowing knowledge of proposed recombinant DNA work. *See, e.g.*, Hoeber Declaration at 3. In addition, the Army was careful to note that if new and different biological agents requiring BL 4 containment or involving genetic alternatives should be used in the future, an "appropriate environmental impact analysis" would be filed in conformance with NEPA and Army regulations: "All proposals for work beyond the scope described in the Environmental Assessment will undergo the appropriate NEPA process, with due attention

given to the security status of any proposed action." Environmental Assessment at 3; *see* Army Regulation 200–2, Chapter 3; Hoeber Declaration at 3; Defendants' Mem. at 8.

In short, the defendants took the position at the hearing, and maintain in their brief, that while the testing of new types of toxins and biological agents at Dugway has been *contemplated*, it has not actually been *proposed*.

A civilian public interest organization necessarily faces innumerable hurdles in obtaining revealing information from the government on national security related matters. The Court is neither oblivious of this fact, nor insensitive to the importance of the competing values and interests involved on both sides. Nevertheless, it is not possible definitively to conclude, on the basis of the administrative record before the Court or the evidence at the hearing, that the defendants' proposal involves a change in the present testing program. The record does not reveal a single affirmative statement of intent to use new types of biological agents in the proposed facility. To the contrary, all of the statements signaled by the plaintiffs are entirely consistent with the defendants' position that the use of new agents may be needed in the future, but have not been proposed for use at the present.

■ Mere *contemplation* of an action is not a sufficient basis for requiring the preparation of an EIS. *Catholic Action* 454 U.S. at 146, 102 S.Ct. at 203. At issue in *Catholic Action* was the environmental impact of a proposal to construct 48 earth covered magazines *capable* of storing nuclear missiles. The Court held that in the absence of an affirmative proposal by the Navy actually to store nuclear missiles in the facility, the Navy could not be required to file an impact statement. To order a statement, the Court reasoned, required "inventing" a "Hypothetical Environmental Impact Statement," 454 U.S. at 144, 102 S.Ct. at 202, that violated the "express intent" and "explicit language" of NEPA. 454 U.S. at 144–45, 102 S.Ct. at 202–03.

An EIS, the Court went on to hold, "need not be prepared simply because a project is *contemplated*, but only when the project is *proposed*." *Catholic Action* 454 U.S. at 146, 102 S.Ct. at 203.

■ In this instance no affirmative proposal to use recombinant DNA has been made. Based on the present record, future use of new toxins is purely speculative. To order an impact statement on this basis, therefore, would effectively require the Army to file precisely the type of "hypothetical" EIS that the Supreme Court has found unacceptable. *See also Aberdeen & Rockfish R.R. v. Students Challenging R.A.P.*, 422 U.S. 289, 320, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975) (time at which agency must prepare its impact statement is the time at which it "makes a recommendation or report on a *proposal* for federal action"); *Kleppe v. Sierra Club*, 427 U.S. 395, 405–06, 96 S.Ct. 2723, 2728–29 (1976) (*id.*).

### B.

■ The first, and central, contention raised by the plaintiffs—focusing on the scope and nature of the proposed federal action—is not dispositive of this case. Indeed, the attention riveted on that issue has to some extent masked a more important one. Under NEPA, the Council on Economic Quality regulations, and the case law of this Circuit, a proposed federal action—regardless of whether it involves new or different technology—must be accompanied by an EIS or an environmental assessment that comports with applicable standards of judicial review. *See supra*, Part IIA. The only exception to this general statutory requirement is for NEPA's so-called "categorical exclusions." 40 C.F.R. § 1508.4 (1983). Here, neither party disputes that a proposal and recommendation for a major federal action has been made. Accordingly, irrespective of whether new biological agents have been proposed for use at Dugway, if the Army's actions are to be held in compliance with NEPA, its Environmental Assessment, containing the finding of no significant impact, must still

satisfy the four-prong standard of review set out in *Cabinet Mountains.* Stated simply, even though *Catholic Action* does not require the preparation of an EIS at this stage of the proceedings, the critical question remains whether the Environmental Assessment prepared by the Army is adequate under NEPA for the precise federal action *that the Army itself claims to have proposed.* It is to this inquiry that the Court now turns.

■ In applying the *Cabinet Mountains* standard, discussed *supra,* Part IIB, this Circuit has recently emphasized that the preparation of an environmental assessment must not be taken lightly. "Simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA.... An environmental assessment that fails to address a significant environmental concern can hardly be deemed adequate for a reasoned determination that an EIS is not appropriate." *Foundation on Economic Trends,* at 154. When taking the requisite "hard look" at the environmental concern, the agency must "evaluate seriously" the risk of possible "environmental disruption." *Foundation on Economic Trends,* at 154. Merely reciting the safety features of a proposed facility without carefully analyzing the possible environmental dangers associated with the proposal does not constitute the type of environmentally informed decisionmaking that the drafters of NEPA had in mind. An environmental assessment must offer something more than a "checklist" of assurances and alternatives. It must indicate, in some fashion, that the agency has taken a searching, realistic look at the potential hazards and, with reasoned thought and analysis, candidly and methodically addressed those concerns.

■ Measured against these standards, the Environmental Assessment published by the Army is clearly inadequate. Aside from a detailed six-page description of the proposed Aerosol Toxin Laboratory, the Environmental Assessment represents but an amalgam of conclusory statements and unsupported assertions of "no impact". Section IV of the Assessment—the portion devoted to the "Environmental Impacts of the Proposed Action and Alternatives"—is nothing more than a single conclusory paragraph:

> It is planned to construct a BL 4 laboratory within an existing building at DPG for work with pathogenic microorganisms and biological toxins. Extensive peer review through all the planning stages of this proposed laboratory ensures that all requirements for safe and efficient operation of a BL 4 containment facility are accomplished and that exposure of laboratory workers or risk to the environment are precluded. Before the facility is placed in operation, and periodically thereafter, exhaustive tests with simulant materials will be used to check the integrity of the entire system. For these reasons, it has been [illegible] quality of the human environment.

Environmental Assessment at 10–11. No mention is made of the unique geographical characteristics of the surrounding area,[9] the degree to which the action is likely to be controversial, the extent to which the possible effects on the human environment are likely to be unknown, the long- and short-term effects of the action on the local region and "on society as a whole," the degree to which the action may adversely affect an endangered or threatened species, and the possibility, if any, that the action may threaten a violation of federal, state, or local laws or requirements imposed "for the protection of the environment." *See* 40 C.F.R. 1508.27 (1983). Indeed, as in *Foundation on Economic Trends v. Heckler,* the assessment does not even directly address the question of whether an EIS

---

**9.** The Environmental Assessment notes only that "[t]he BL 4 laboratory will be located approximately 95 miles southwest of Salt Lake City and about 60 air miles southwest of Tooele, the nearest town of significant size. A map of

should be prepared.[10] *See Foundation on Economic Trends*, at 154 ("[s]uch an inquiry is, of course, the ultimate purpose of an environmental assessment").

The fact that BL 4 maximum containment facilities have been operated safely in other locations has no bearing on the adequacy of this Assessment. As detailed in the regulations, what matters is the possible impact that this particular major federal action may have in the particular location for which it has been proposed. *See* 40 C.F.R. § 1508.27 (1983). Just as claims by the Army that Dugway testing—even with the proposed facility—will continue unchanged do not affect the standard governing the preparation of an environmental assessment, *see supra*, Part III B, so the safe operation of a similar facility in a different location does not affect the number and type of issues and concerns that the environmental assessment must address.[11]

Without more, the Court cannot conclude that this Assessment "identif[ies] the relevant areas of environmental concern" or

DPG and Utah is shown in Fig. 2." Environmental Assessment at 3.

**10.** The defendants argue that this Circuit's recent decision in *Foundation on Economic Trends* is not applicable because unlike this case, the Circuit case involved the deliberate release of genetically altered matter into the environment. For the purposes of analysis here, however, this distinction—while valid—is hardly relevant. Regardless what proposed major federal action is involved, in the absence of a claim of "categorical exclusion", the standards of review for an environmental assessment set out in *Foundation on Economic Trends* are applicable here and, accordingly, must be followed.

**11.** The defendants surely would not argue, for example, that the safe operation of a nuclear reactor—or other power project—in one part of the country would eliminate the need to comply with NEPA's environmental assessment requirement before undertaking the construction of a nuclear reactor in another part of the country.

**12.** The plaintiffs raise a series of contentions concerning specific considerations that they believe should have been addressed in the Environmental Assessment. The plaintiffs contend that the Environmental Assessment should have included a "worst case" analysis, an evaluation

takes a "hard look" at the environmental problem, as required under parts 1 and 2 of the four-prong *Cabinet Mountains* standard.[12]

## IV.

### Balance of Harms

■ Having concluded that a violation of NEPA has occurred, the question remains whether injunctive relief in this instance is proper. Although an injunctive remedy does not "follow automatically" from every finding of a violation of NEPA, a presumption exists in favor of injunctive relief. *State of Alaska v. Andrus*, 580 F.2d 465, 485 (D.C.Cir.1978); *Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502, 513 (D.C.Cir.1974); *Realty Income Trust v. Eckard*, 564 F.2d 447 (D.C.Cir.1977). Courts have enjoined ongoing projects

primarily to preserve for the relevant decision maker the full opportunity to choose among alternatives that is contemplated by NEPA. By maintaining

of "physical" as opposed to "biological" containment, a more comprehensive discussion of alternative "simulant" toxins and agents, and a more detailed analysis of the possible hazard of working with aerosols.

In reviewing the Environmental Assessment, the Court must determine whether, taken as a whole, the Assessment addresses the critical and significant areas of environmental concern. The significance of the agency's failure to address a particular factor must be evaluated in light of the entire four-prong *Cabinet Mountains* standard.

In this instance, the Court concludes only that the Army's Assessment has failed to take the requisite "hard look". Whether the agency shall choose to discuss containment procedures, the use of simulants, or the specific hazards of aerosols in future assessments, is a technical decision that rests with the agency. Of sole concern to this Court is simply that the Assessment, when completed, provide "convincing reasons why potential impacts are truly insignificant" by addressing and analyzing the critical areas of environmental concern. *Maryland-National Capital Park*, 487 F.2d at 1040. "Worst case" analyses, and *comprehensive or exhaustive* discussions of alternatives, while not expressly required in so many words by statute or case law, may ultimately prove helpful in achieving this end.

the status quo, while additional environmental studies are performed, or additional alternatives are considered, an injunction ensures that there will be at least a 'possibility' that the agency will 'change its plans in ways of benefit to the environment. It is this possibility that courts should seek to preserve.' *State of Alaska,* 580 F.2d at 485, *quoting Jones,* 499 F.2d at 513.

Each case requires a "particularized analysis" of the violations that have occurred, and the "countervailing considerations" of the public interest. *State of Alaska,* 580 F.2d at 485. The injunctive remedy, if ordered, must not be overly broad:

> When a court has found that a party is in violation of NEPA, the remedy should be shaped so as to fulfill the objectives of the statute as closely as possible, consistent with the broader public interest.... The court should tailor its relief to fit each particular case, balancing the environmental concerns of NEPA against the larger interests of society that might be adversely affected by an overly broad injunction.

*Environmental Defense Fund v. Marsh,* 651 F.2d 983, 1005–06 (5th Cir.1981). *See also Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n,* 606 F.2d 1261, 1272 (D.C.Cir. 1979).

 In this instance an injunctive remedy is required. The NEPA violation involved here is substantive, not "technical." *Cf. Friends of River v. FERC,* 720 F.2d 93, 106–07 (D.C.Cir.1983) (substantial compliance with NEPA in combination with futility of remand justifies approval of otherwise inadequate EIS). Although the Army has not proposed the use of genetically altered material in its testing program at the new facility, potential risks to the environment remain. Pathogenic agents and toxins, as well as non-pathogenic (simulant) microorganisms, will be used in the new aerosol facility. The possibility of an accident involving personnel, or exposure to the outside environment, while low in prob-

ability, does exist. Clearly the risks are serious and farreaching. Such an accident could produce extraordinary, potentially irreparable, consequences. Given the deadly nature of the material being tested, considerations of the larger interests of society—particularly concerns for public health and safety—militate heavily in favor of enjoining construction. The second, third and fourth prongs of the traditional test for granting injunctive relief, therefore, are met. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 842–843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958) (the district court should consider (1) the plaintiff's likelihood of prevailing on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of injunctive relief, (3) the possibility of substantial harm to other interested parties from the injunctive relief, and (4) the interests of the public).

Irreparable injury to the plaintiffs, and other interested parties, exists for a second reason. Should the defendants seek to proceed with the construction of the proposed facility, they must recognize that now is the appropriate time for filing an *adequate* environmental assessment, before an "irretrievable commitment[ ] of resources is invested in the construction of the proposed facility." *Sierra Club v. Peterson,* 717 F.2d at 1414; *Scientists' Institute for Public Information v. AEC,* 481 F.2d 1079, 1098 (D.C.Cir.1973). It is imperative that the public, and the defendants, know *before construction begins* whether or not an EIS must be prepared, a matter that can be determined only upon the development of an environmental assessment which satisfies the law's rigorous requirements. If an impact statement should, in fact, be required, environmental studies would have to be undertaken before work on the laboratory began. *Sierra Club,* 717 F.2d at 1414.

Nonetheless, the Court is particularly sensitive that national defense concerns be carefully weighed in the calculus. On the one hand, disclosure of national security

information in a more adequate assessment need not be feared. The Supreme Court has expressly held that the public disclosure requirements of NEPA are governed by FOIA's national security exemption. *See Catholic Action*, 454 U.S. at 145, 102 S.Ct. at 202. On the other hand, an undue delay in the construction of the proposed facility may well affect DOD's ability to meet legitimate defense and national security needs, and could, indeed, be devastating. Balancing the environmental considerations of NEPA against these defense concerns, *see Marsh*, 651 F.2d at 1005–06, this ruling is narrowly tailored to take those matters into account. Because an environmental assessment, as a general matter, need be less detailed than an environmental impact statement, any delay incurred in the construction of the proposed facility by reason of this injunction would be insubstantial, should the defendants elect to proceed in compliance with the mandate of NEPA.

With the mighty power and resources of our government, the defendants control the substance, timing and manner in which an adequate environmental assessment can be produced. They can determine the urgency of the situation and move accordingly.

## V.

### *Conclusion*

In reaching the difficult decision rendered today, the Court has carefully avoided substituting its own judgment for that of the agency involved. Mindful that administrative decisions should be set aside " 'only for substantial procedural or substantive reasons as mandated by statute ..., not simply because the court is unhappy with the result reached' ", *Baltimore Gas & Electric*, 462 U.S. at 87, 103 S.Ct. at 2246, *quoting, Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460, it is concluded on the basis of the present administrative record that the defendants have not "adequately considered and disclosed the environmental impact of [their] actions" and their decision, therefore, is arbitrary and capricious. *See Baltimore Gas & Electric*, 462 U.S. at 97–98, 103 S.Ct. 2252–2253. Although the Army has not actually proposed a change in the type of testing done at Dugway, the Environmental Assessment must still comport with the requirements of NEPA. The present Environmental Assessment does not.

Accordingly, permanent injunctive relief shall be granted. A separate Order accompanies this Memorandum Opinion.