**FOUNDATION ON ECONOMIC TRENDS, et al., Plaintiffs,**

v.

**Richard LYNG, et al., Defendants.**

**Civ. A. No. 86–1130.**

United States District Court, District of Columbia.

Jan. 11, 1988.

---

Edward Lee Rogers, Washington, D.C., for plaintiffs.

Pauline H. Milius, Land and Nat. Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiffs[1] brought this action on April 23, 1986, seeking to suspend and revoke the license defendants[2] issued permitting marketing of the pseudorabies vaccine "Omnivac." The case is before the Court on the parties' cross-motions for summary judgment. After consideration and review of the motions, oppositions, replies, supporting memoranda, and the entire administrative record, the Court shall grant defendants' motion and deny plaintiffs' motion.

### I. BACKGROUND

The United States Department of Agriculture Animal & Plant Health Inspection Service ("USDA–APHIS") controls the production and marketing of veterinary medicines including vaccines through a licensing process under the Virus–Serum–Toxin Act ("VSTA"), 21 U.S.C. §§ 151–158 (1982), and applicable regulations, 9 C.F.R. pt. 102

---

**1.** Plaintiffs are the Foundation on Economic Trends ("FET"), a private nonprofit organization active on issues of biotechnology and genetic engineering; Jeremy Rifkin, president of FET and an activist in the area of biotechnology and genetic engineering; and Dr. Michael W. Fox, Scientific Director of the Humane Society of the United States. All plaintiffs reside in the District of Columbia.

**2.** Defendants are Richard Lyng, Secretary, United States Department of Agriculture ("USDA"); Bert W. Hawkins, Administrator of the Animal & Plant Health Inspection Service ("APHIS"), USDA; and J.K. Atwell, Deputy Administrator, Veterinary Services, USDA–APHIS. All are sued in their official capacities.

(1987). USDA–APHIS may grant a license only after reviewing a product and evaluating its safety, efficacy, purity, and potency. 9 C.F.R. § 102.3(b)(2)(ii) (1987). Vaccines and other veterinary biological products that are prepared using biotechnological or "genetic engineering" procedures must comply with these licensing regulations. *E.g.*, Final Policy Statement for Research and Regulation of Biotechnology Processes and Products, 51 Fed.Reg. 23,336 (June 26, 1986).

In addition, USDA–APHIS is subject to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370 (1982), and the agency must prepare an environmental impact statement for any major federal action having a significant impact on the human environment. No environmental impact statement is required if the agency finds that the action will have no significant impact. To determine the impact of an action, the agency must prepare an environmental assessment, which summarizes the available environmental evidence and presents the agency's analysis of relevant data. 40 C.F.R. § 1508.9 (1987). USDA–APHIS guidelines implementing NEPA require preparation of an environmental assessment "for each proposed new action." APHIS Guidelines Concerning Implementation of NEPA Procedures. 44 Fed.Reg. 50,381, 50,382 (Aug. 28, 1979). The parties do not dispute that the licensing of Omnivac was a "proposed new action" requiring an environmental assessment.

The license application at issue was submitted to USDA–APHIS in December, 1984, by Biologics Corporation, a subsidiary of TechAmerica Group Inc. Novagene, Inc., had developed the vaccine in 1982, under the guidance of Dr. Saul Kit. The vaccine was designed to combat pseudorabies, a contagious disease affecting swine and other livestock. In its natural state, the pseudorabies virus may retreat to the nerve cells of a recovered animal and lie dormant, unaffected by the body's immune system. The dormant virus may be reactivated in this outwardly healthy animal and may then spread to other animals as the carrier "sheds" the virus.

Existing pseudorabies vaccines have been prepared from killed or modified live strains of the virus. The modified live virus vaccine is assertedly the most effective, but generally retains the ability to be harbored in the host's nerve cells and then spread to other animals. While these animals are not infected with a disease-producing virus, they will test positive for infection, complicating diagnosis and health programs.

Omnivac was developed by weakening an existing modified live strain of the virus (Bucharest strain). Researchers deleted the gene that produces the enzyme thymidine kinase ("TK"), which is essential for the survival and replication of the virus. As a result, the TK⁻ vaccine virus cannot survive and multiply in nerve cells, unlike the existing wild strain and weakened vaccine virus strain.

The Administrative Record documents the progress of TechAmerica's application through USDA–APHIS's review process. Dr. George Shibley, Senior Staff Microbiologist at the Veterinary Services Division of USDA–APHIS, monitored the license procedure for Omnivac. Declaration of Dr. George Shibley ("Shibley Decl."), ¶ 9. After a little more than one year of review, testing, and reporting, USDA–APHIS issued a United States Veterinary Biological Product License to TechAmerica on January 16, 1986. USDA–APHIS did not issue or prepare an environmental assessment or environmental impact statement before it granted the license. The Foundation on Economic Trends petitioned USDA–APHIS in early April, 1986, to revoke or suspend the Omnivac license, based in part on USDA–APHIS's failure to comply with NEPA. The agency suspended the license and prepared a lengthy environmental assessment to document the environmental concerns that were "fully identified and reviewed by Department officials prior to licensing the vaccine." Environmental Assessment, Administrative Record ("Admin. Rec."), Tab 22B.

USDA–APHIS concluded that the licensing of Omnivac would not have a signifi-

cant impact on the environment, based on the following facts:

(1) deletion of the genetic element necessary for reproduction prevents the TK⁻ virus from establishing latency;

(2) conventional methodology had been used to render the Bucharest virus strain noninfectious prior to the gene deletion;

(3) studies on susceptible host animals demonstrated no transmission of the TK⁻ virus;

(4) deletion of the TK gene and the consequent inability of the virus to replicate will result in reduced dissemination of the virulent virus through shedding;

(5) TK deletion is a stable characteristic, and any reversion and reacquisition of the TK gene would produce latency but not virulency;

(6) there is no likelihood of oncogenicity, as the TK⁻ virus contains no new genetic information from the non-oncogenetic wild pseudorabies virus;

(7) the TK⁻ virus demonstrated reduced virulence in other animals;

(8) like the existing virus strains, the TK⁻ virus is avirulent to humans; and

(9) demonstrated inability of the TK⁻ virus to revert to the wild virus strain, as distinct from the weakened strain from which it is crafted.

*Id.* The scientific data requested and submitted from which USDA–APHIS drew these conclusions are presented in the environmental assessment and are discussed more fully below.

The belated Omnivac environmental assessment was released on April 22, 1986, and notice of its availability was published in the Federal Register. 51 Fed.Reg. 15,-657 (Apr. 25, 1986). The suspension was lifted immediately and Omnivac production resumed. Plaintiffs filed this action on April 23, 1986, seeking declaratory and injunctive relief. Plaintiffs did not apply for temporary or preliminary injunctive relief. Cross-motions for summary judgment were submitted after the Administrative Record was filed. Plaintiffs contend that USDA–APHIS violated the VSTA and applicable regulations in issuing the license, and that the agency failed to comply with NEPA. Defendants challenge plaintiffs' standing, and assert that USDA–APHIS complied with the law in issuing the license.

## II. DISCUSSION

The Court may grant summary judgment only when the movant has demonstrated that there are no genuinely disputed issues of material fact, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, the Court must resolve all disputes and draw all reasonable inferences in favor of the non-movant. Nonetheless, to successfully oppose a well-supported motion for summary judgment, the non-movant must go beyond its pleadings to offer evidence in support of its allegations. *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The Court has applied this standard to the record herein and concludes that summary judgment should be entered for defendants.

### A. *Plaintiffs' Standing to Challenge the Omnivac License*

Plaintiffs challenge USDA–APHIS's issuance of a license for Omnivac under the VSTA, claiming that the action violated the requirements of the VSTA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701–705 (1982), and that they have been adversely affected. To establish standing to assert this claim under section 702 of the APA, plaintiff must satisfy three well-known conditions: (1) injury in fact; (2) "fairly traceable" to USDA–APHIS's allegedly unlawful conduct; (3) that is "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). In addition, plaintiffs must demonstrate that their injury is within the zone of interests to be protected by the VSTA, and that it is not a generalized grievance "more appropriately addressed to the representative branches." *Id.*

Plaintiffs, all residents of Washington, D.C., regularly use and enjoy the United States' environmental resources, including parks and other recreational lands. Complaint ¶ 5. They assert that this use and enjoyment is dependent on the welfare and biological integrity of domesticated and wild animals. *Id.*; Pltf.Opp. at 21. USDA–APHIS's grant of a license for Omnivac, by permitting release of a genetically altered virus vaccine into the environment, allegedly threatens to harm domestic and wild animals, thus injuring plaintiffs. *Id.* Although the genetically altered gene has been released, plaintiffs have not shown that harm to animals has actually occurred. Accordingly, actual injury to the environment and to its ecosystems, and plaintiffs' use and enjoyment thereof, has not been shown.

Plaintiffs contend that the *threat* of potential environmental harm is nonetheless a cognizable injury under 5 U.S.C. § 702. Threatened environmental injury may be sufficiently "personal" to satisfy constitutional and statutory standing requirements only if presented by a plaintiff with a "particularized" injury. *E.g., United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Although plaintiffs' allegation of injury would likely meet the particularity requirement if tested on a motion to dismiss, this Circuit recently made clear that the plaintiff must make a "greater showing" of specific, personalized injury in response to a summary judgment motion. *Wilderness Society v. Griles*, 824 F.2d 4, 15–17 (D.C.Cir.1987).

In *Wilderness Society*, plaintiffs challenged a policy of the Bureau of Land Management (BLM) of the Department of Interior changing the method of measuring Alaskan land to be shifted from federal to state or native ownership. *Id.* at 7. Plaintiffs alleged that they used federal public lands in Alaska, that BLM had transferred land under the new policy, and that the regulations required transferred lands to abut existing native holdings. *Id.* at 16. The court stated that while these allegations would have overcome a motion to dismiss for lack of standing, they were insufficient to oppose summary judgment, noting that "since [plaintiffs] do not know which of the many possible abutting lands will actually be affected by the new policy, [they] cannot tell us whether the lands they intend to use are among them." *Id.* As a result, the plaintiffs failed to show an injury sufficiently particularized to have standing to challenge the policy. *Id.* at 17.

■ In order to meet this particularized environmental injury requirement, plaintiffs herein must identify a specific natural resource which they use and enjoy, and which will be injured, or has been injured, by release of the TK⁻ pseudorabies vaccine. *See id.* at 12. Unless plaintiffs establish a sufficient likelihood of occurrence of the threatened injury, "the threat of injury would be too amorphous or uncertain; it would be no greater for the plaintiff than for any person simply opposed to the governmental action in question." *Id.* The plaintiffs have failed to show specificity of resource, use, enjoyment, and injury, and accordingly lack standing to raise their VSTA and APA claims.

### B. *Plaintiffs' Claim Under NEPA*

Plaintiff FET has standing to seek review of USDA's compliance with NEPA, based on its claim that the agency's noncompliance affected FET's ability to provide information to the public. *E.g., Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1086–87 n. 29 (D.C.Cir.1973); *see also Foundation on Economic Trends v. Lyng*, 817 F.2d 882 (D.C.Cir.1987) (reviewing gravamen of plaintiffs' challenge to USDA's compliance with NEPA; implicitly assuming existence of standing). FET alleges that USDA–APHIS's environmental assessment ("EA") on Omnivac was inadequate.[3] The Court

---

**3.** FET also challenged the EA as untimely. While USDA–APHIS candidly states that "it would have been preferable to do the assessment before the license was issued," Def.Brief at 37, any separate claim based solely on failure to prepare a pre-license EA has been mooted by USDA–APHIS's compilation and release of an Omnivac EA. The timing and method of prepa-

must ordinarily ask four questions in deciding whether an agency's finding of "no significant impact" in an environmental assessment is arbitrary and capricious:

> (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established what changes in the project sufficiently reduced it to a minimum.

*Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir.1982). Within this framework, review of USDA–APHIS's decision not to prepare an EIS "must be undertaken with a view merely to determine if the agency has taken the 'hard look' at the environmental consequences of the action that NEPA requires." *Foundation on Economic Trends v. Weinberger,* 610 F.Supp. 829, 838–39 (D.D.C.1985). To survive review, the agency's environmental assessment "must indicate, in some fashion, that the agency has taken a searching, realistic look at the potential hazards and, with reasoned thought and analysis, candidly and methodically addressed those concerns." *Id.* at 841.

The EA prepared on Omnivac found that use of recombinant TK⁻ pseudorabies vaccine would not have significant impact on the environment. The EA discusses the characteristics of existing strains of wild and modified pseudorabies, describing among other factors the transmission, range, pathogenesis, latency, and survival of the TK⁻ pseudorabies vaccine, and sum-agency's review of the same characteristics of the TK- pseudorabies vaccine, and summarizes the data supporting the scientific conclusions. USDA–APHIS concluded that the TK⁻ virus is stable, avirulent, unlikely to be transmitted, and unable to establish latency, and accordingly, would have no significant impact on the environment.

■ FET initially asserts that USDA–APHIS failed to consult with other agencies, internal advisory committees, and the public, in violation of applicable regulations. None of the regulations, internal memoranda, or policy statements requires the review plaintiffs seek. Applicable APHIS regulations implementing NEPA require public involvement where program changes will have significant adverse effects on the environment, when APHIS intends to prepare an EIS, and when a draft or final EIS or a finding of no significant impact is available. APHIS Guidelines Concerning Implementation of NEPA Procedures, 44 Fed.Reg. 50,381, 50,383 (Aug. 28, 1979). Applicable USDA regulations leave to the agency's discretion when to seek additional public involvement. 7 C.F. R. § 1b.1(a) (1987) (incorporating Council on Environmental Quality ("CEQ") regulations); 40 C.F.R. § 1506.6 (1987) (CEQ regulation concerning public involvement). The guidelines upon which FET relies to establish interagency and advisory committee review requirements apply, if at all, to the licensing process, and are not mandated by NEPA and its implementing regulations.[4] To the extent regulations and pro-

---

ration, however, remain relevant to the Court's consideration of the EA's adequacy.

**4.** Evidence that USDA–APHIS failed to comply with mandatory internal review or interagency consultation requirements is relevant to a claim that the agency failed to take a "hard look" at environmental consequences and accordingly is summarized and discussed briefly. The NIH Guidelines FET seeks to apply are triggered only by a "deliberate release" of a recombinant DNA organism, and USDA–APHIS early took the position that even if an action was found to be a "deliberate release," it was within USDA–APHIS's discretion to seek interagency approval of a product license. *See* USDA–APHIS Veterinary Services Memorandum No. 800.68 (Dec. 4,

1984), Def.Ex.E. FET notes that applicable NEPA regulations require the agency to independently verify any data submitted by an applicant for possible use in preparing an EIS. 40 C.F.R. § 1506.5(a) (1987). USDA–APHIS did conduct independent statistical analysis of raw data, specify testing protocol, and submit certain materials to the National Veterinary Services Laboratory for confirmation. Decl. of Dr. George Shibley, ¶ 16; Decl. of Dr. James E. Tanner, ¶ 3; Admin.Rec., Tabs 12–C, 16–D. Finally, the review by the internal Agricultural Recombinant DNA Research Committee ("ARRC") was in an advisory capacity. 49 Fed. Reg. 50,903 (Dec. 31, 1984). No mandatory procedures for internal review existed, apart

tocol required preliminary consultation, USDA–APHIS provided it.

■ FET challenges the substance of USDA's conclusions in the EA, delineating what it considers to be deficient testing and inadequate review of data submitted in support of the application. FET's principal concern is with the "safety data" USDA received and compiled. FET raises legitimate complaints about the failure of the original researcher, Dr. Saul Kit, to comply with established reporting and notification requirements in the conduct of an open air test of the vaccine. Even if USDA knew of Dr. Kit's transgressions, the Court cannot conclude that it was "arbitrary and capricious" to consider the data collected.[5]

FET finally argues that the tests and data reflected in the EA do not resolve issues it asserts are central to the nature and effect of Omnivac. USDA presents evidence contradicting these claims, rebutting both the assertion that specific issues were not resolved and the claim that the issues are "central" to the nature and effect of the vaccine.[6] After careful review of the record, the Court notes that some of the testing "deficiencies" FET recounts reflect the nascency of the field of genetic engineering rather than truncated examination of the product by the agency.

The Court is not in the same position as the agency in its review of the scientific data submitted, and cannot replace the agency's judgment with its own. Upon examination of the environmental assessment and the supporting Administrative Record, the Court concludes that the finding of no significant impact was not arbitrary and capricious. Accordingly, summary judgment shall be granted in defendants' favor under the NEPA claim.

An appropriate order accompanies this opinion.

### ORDER OF DISMISSAL

Upon consideration of the pending motions, memoranda, and the administrative record, and in accordance with the accompanying opinion, it is this 7th day of January, 1988,

ORDERED that plaintiffs' motion for summary judgment is denied; defendants' motion for summary judgment is granted; and this case is dismissed in its entirety.

---

from this interim policy. The only evidence on this issue indicates that the ARRC was advised informally of the licensing process.

5. This conclusion in no way lessens the seriousness of the researcher's flouting of strict reporting requirements. These antecedent actions, however, are not properly within the scope of NEPA review, as they do not detract from the raw data received. Unquestionably, agency enforcement of reporting requirements could include a mechanism barring consideration of data not in compliance with regulatory procedure. USDA–APHIS was not under such a limitation, and the Court will not enter an arena more appropriately occupied by legislative and regulatory authorities.

In further support of its efforts to undermine the data submitted to USDA–APHIS, FET presents the various allegations made in a lawsuit between Novagene and TechAmerica filed on October 10, 1986. The positions these parties have taken in litigation, long after USDA–APHIS's review of Omnivac, has no bearing on the adequacy of the agency's review or the sufficiency of the data before it at the time it granted the license.

6. FET's principal concern is the lack of conclusive data on the potential teratogenicity of Omnivac when ingested by pregnant sows. The vaccine was not specifically approved for administration to pregnant sows, however, until teratogenicity data was received and reviewed, after the initial license was granted. Shibley Decl., ¶ 29.