SOUTHERN UTAH WILDERNESS ALLIANCE, the Wilderness Society, Sharon and David Hatfield, Tina Marie Ekker, and the Humane Society of the United States, Plaintiffs,

v.

Hugh THOMPSON, Forest Supervisor for the Dixie National Forest, Tobias Martinez, Forest Supervisor for the Fishlake National Forest, Gray Reynolds, Regional Forester for the Intermountain Region, Marvin Turner, District Ranger for the Teasdale Ranger District of the Dixie National Forest, Ronald Wilson, District Ranger for the Cedar City Ranger District of the Dixie National Forest, and the United States Forest Service, Defendants.

Civ. No. 92–C–0052A.

United States District Court, D.Utah, C.D.

Jan. 15, 1993.

Stephen Koteff, Southern Utah Wilderness Alliance, Salt Lake City, UT, for plaintiffs.

Stephen Roth, Asst. U.S. Atty., Salt Lake City, UT, for defendants.

ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

ALDON J. ANDERSON, Senior District Judge.

This matter came before the court on Plaintiffs' Motion for a Preliminary Injunction. The court heard oral argument on November 5, 1992, and took the matter under advisement. Stephen Koteff of the Southern Utah Wilderness Association, Salt Lake City, Utah, argued on behalf of Plaintiffs. Stephen Roth, Assistant United States Attorney, represented Defendants. The court, having reviewed the voluminous record and the applicable law, hereby denies Plaintiffs' Motion for a Preliminary Injunction.

## I. BACKGROUND

The Dixie and Fishlake National Forests support numerous types of wildlife and serve as grazing areas for livestock. Historically, Animal Damage Management ("ADM") decisions in these forests have led to conflicts between the supporters of the wildlife and of the domestic populations, especially because the ADMs authorize Animal Damage Control ("ADC"), which involves the control and reduction of predator species population, such as cougars and coyotes, through non-lethal and lethal control methods. Despite these conflicts, ADC programs have been conducted successfully since 1973, excluding 1991 and 1992.

Various statutes, regulations, and plans guide the implementation of ADC programs. Federal authority for ADM programs emanates from the Animal Damage Control Act of 1931, 7 U.S.C. §§ 426 to 426b (the "ADCA"), which directs the Secretary of Agriculture to "conduct campaigns for the destruction" of animals injurious to agriculture and livestock on the national forest and the public domain. Authority to conduct ADC programs currently resides with the Animal and Plant Health Inspection Service—Animal Damage Control ("APHIS—ADC").

The National Forest Management Act, 16 U.S.C. § 1604(i) (1988) ("NFMA"), authorizes the Forest Service to manage land designated as National Forests and assess the environmental impact of ADC programs. The Forest Service Manual ("FSM") prepared under authority of the NFMA provides further guidance for implementation of ADM programs. In the FSM, the forest service recognizes the authority of the APHIS—ADC to conduct animal damage management services. The FSM requires both the forest service and the APHIS—ADC to reduce the damage done to wildlife by predation and to conduct ADM activities when predation causes or threatens to cause damage to livestock. FSM §§ 2650.3(9), 2650.1(4).

This shared responsibility and coordinated effort is memorialized in a Memorandum of Understanding ("MOU") prepared at the national level between the forest service and the APHIS—ADC. The MOU details the respective authority of each division. Generally, the APHIS—ADC is responsible for documenting predation loss and conducting the actual predation control pursuant to the ADCA, and the Forest Service is responsible for managing the land under its jurisdiction and for insuring compliance with environmental statutes.

Notwithstanding federal jurisdiction in this area, the states retain a significant amount of authority. State law authorizes ranchers with livestock on national forest allotments to protect their herds from predation. State law plays an important role in predator control in other ways. For example, federal statutes provide that state civil and criminal jurisdiction extends to forest reserves. 16 U.S.C. § 480 (1988). This jurisdiction includes the application of state wildlife and game laws to hunting, trapping, and fishing activities on the national forests. See also 16 U.S.C. § 528 (1988); 43 U.S.C. §§ 1701, 1732(b) (1988) (Federal Land Policy and Management Act of 1976).

Under its authority, the State of Utah has protected two predators: (1) cougars and (2) black bears. The state, however, has not protected coyotes, but rather regulates coyotes as a predatory animal. Utah Code Ann. § 4-23-3 (1988). Coyote regulation extends to federal lands, including national forest land. Utah Code Ann. § 4-23-10 (1988). Because coyotes are a nonprotected predatory animal, ranchers suffering predation loss may practice predator control methods against them. Consequently, because of this overlapping authority and of the possible conflict in state and federal predator control programs, both the Dixie and the Fishlake National Forest Plans call for cooperation between the state and federal agencies responsible for predator control.

In establishing an ADC program, the forest service is subject to other statutory constraints. First, as provided in the MOU, the forest service must comply with the National Environmental Policy Act, 42 U.S.C. § 4321-4347 (1988) ("NEPA"), by analyzing the environmental effects of a

proposed ADC program. If the program involves serious environmental impact, the agency must prepare an Environmental Impact Statement ("EIS"). If, however, the agency determines that the proposed program will involve minimal environmental impact, referred to as a Decision Notice and Finding of No Significant Injury ("FONSI"), the agency fulfills its NEPA mandate by preparing a less comprehensive environmental assessment ("EA").

In addition to its environmental obligations, the Forest Service must comply with its forest management obligations under the NFMA and the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) (1988) ("APA"). The NFMA requires the forest service to limit management decisions to those consistent with its forest plan. The APA requires that the forest service base its decision on the administrative record that it has compiled. Any agency decision coming under the APA must not be arbitrary or capricious or in violation of other applicable law, in this case NEPA or the NFMA.

On April 25, 1991, Thompson, the supervisor of the Dixie National Forest, issued a FONSI and EA, which authorized a full range of non-lethal and lethal control methods, including aerial gunning, a type of lethal predator control in which predators are tracked and shot from a helicopter. The decision requires ranchers to use a combination of the following non-lethal control measures: using of guard dogs; changing bed grounds daily; having the herder camp with the herd; disposing of dead sheep at least one-half mile away from the grazing band; using more than one herder with the band; avoiding areas where historically predation has been high; using experienced herders; and using more and better quality dogs. Under the EA, the rancher must diligently apply non-lethal control measures before the forest service will authorize lethal control. When non-lethal measures prove ineffective, the forest supervisor then has available a full range of lethal control measures, including leghold traps and snares, hunting by calling and shooting, denning,[1] the use of hunting dogs, M–44s,[2] and the most objectionable measure, aerial gunning.[3]

Six separate appeals of Thompson's decision were filed with Regional Forester pursuant to 36 C.F.R. § 217 (1992). These appeals were consolidated, and on September 16, 1991, Gray F. Reynolds, Regional Forester, denied the appeals, affirming the forest supervisor on all points. Reynolds's decision, having the force of a final decision of the Department of Agriculture, prompted Plaintiffs to appeal to this court.

On January 15, 1992, three public interest groups, the Southern Utah Wilderness Alliance, The Wilderness Society, and the Humane Society of America; and three private individuals, Sharon and David Hatfield and Tina Marie Ekker [hereinafter collectively referred to as Plaintiffs], brought suit against the forest service, alleging that the proposed Dixie ADC program violates the APA, NEPA, and the NFMA. Plaintiffs seek injunctive and declaratory relief.

On January 17, 1992, the parties agreed by stipulation that the forest service would refrain from implementing the Dixie ADC plan until the court ruled on the merits of Plaintiffs' claims. Under the terms of the stipulation, the forest service agreed to refrain "from implementing, or causing or allowing to be implemented, any lethal predator control measures to reduce predation on permittee livestock in the Dixie National Forest, except with written leave of the Court." Stipulation at 4.

Similar events occurred with respect to ADC on the Fishlake National Forest. On October 1, 1991, James A. Winnat, state director of the APHIS—ADC, wrote to Tobias A. Martinez, supervisor of the Fishlake National Forest. Winnat's letter detailed predation losses to livestock over the

---

**1.** Denning involves the killing of coyote pups in the den.

**2.** M–44s eject a cloud of sodium cyanide gas when activated by the coyote.

**3.** Aerial gunning is authorized only in the winter months and only in areas where other lethal methods have been unsuccessful.

previous two years in the Fishlake National Forest and requested that Fishlake allow APHIS—ADC to conduct predator control on the forest. Fishlake Administrative Record at 100058 [hereinafter Fishlake AR]. In response to this request, Martinez requested public input regarding the proposed program. Over the next two months, Fishlake officials gathered information and prepared the environmental reports necessary to comply with NEPA.

On January 9, 1992, Martinez issued a FONSI and EA. The Fishlake EA provides for the same range of non-lethal and lethal control measures specified in the Dixie EA. Plaintiffs allege that this decision is identical to the EA previously issued by the supervisor of the Dixie National Forest. Accordingly, to streamline the administrative process, the parties agreed on February 29, 1992, to consolidate Plaintiffs' challenge to the Fishlake ADC plan with the pending suit covering the Dixie ADC plan. On March 10, 1992, the stipulation prohibiting implementation of the ADC on the Dixie National Forest was extended to include the Fishlake ADC plan. On August 10, 1992, the court denied a Motion to Allow Limited Emergency Predator Control, because the need expressed did not justify disrupting the status quo prior to a full review of the record. Hearing on the preliminary injunction followed on November 5, 1992. At the November 5, 1992 hearing, the court directed that the January 17, 1992 stipulation, as modified by the March 10, 1992 stipulation, which prohibits implementation of the ADCs without leave of the court remain in effect until the court issues its order on Plaintiffs' Motion for Preliminary Injunction. By an Order dated December 29, 1992, issued while this Order was pending, this court clarified that no lethal predator control should be conducted on the respective forests without thirty days notice to Plaintiffs.

## II.  DISCUSSION

### A.  Standard for Injunctive Relief

■ To prevail on a motion for preliminary injunction, a plaintiff must establish both its standing and the requirements of a preliminary injunction. A plaintiffs' standing, or right, to judicial review of an agency decision, if any, resides in Section 702 of the APA, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1988). For purposes of Section 702, "agency action" means "final agency action." See 5 U.S.C. § 704 (1988). The parties do not dispute that the denial of Plaintiffs' appeals by the regional forester constituted a final agency action which opened the door for this legal action.

■ To establish standing to challenge the EAs, Plaintiffs must show that they have "suffered legal wrong" or are "adversely affected or aggrieved by action within the meaning of a relevant statute." Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). Recreational use and aesthetic enjoyment, as have been claimed by Plaintiffs, "are among the sorts of interests that [the relevant statutes, NEPA and NFMA,] were specifically designed to protect." Id. at 886 & 110 S.Ct. at 3187. In its Complaint and subsequent Affidavits, Plaintiffs have set forth with specificity their use of the both the Dixie and Fishlake National Forests. The court is satisfied that, as a matter of law, Plaintiffs fall within the zone of interest sought to be protected by the relevant statutes, and accordingly, concludes that Plaintiffs have standing to seek judicial review.

■ Having standing to challenge the EAs, Plaintiffs have the burden of clearly establishing the need for injunctive relief. Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc., 883 F.2d 886, 888–89 (10th Cir.1989). The traditional elements of injunctive relief are as follows: (1) whether plaintiff has a substantial likelihood of success on the merits; (2) whether, in the absence of injunctive relief, plaintiff faces the threat of irreparable injury; (3) whether plaintiff's potential injury outweighs any damage to defendants; and (4) whether the injunction will be adverse to

the public interest. *Id.* at 889. These requirements apply to Plaintiffs' NEPA and APA challenge. *Id.; Albright v. Board of Educ.,* 765 F.Supp. 682, 686 (D.Utah 1991). "Although an injunctive remedy does not follow automatically from every finding of a violation of NEPA, a presumption exists in favor of injunctive relief," especially when the NEPA violation is substantive, rather than technical. *Foundation on Economic Trends v. Weinberger,* 610 F.Supp. 829, 843 (D.D.C.1985). Consequently, the heart of Plaintiffs' challenge is to establish the likelihood of success on the merits by demonstrating that the ADCs violate either the APA or NEPA. If the court finds a substantial likelihood that the ADCs violate either the APA or NEPA, injunctive relief is presumptively available because Plaintiffs would then have established a substantial likelihood of success on the merits. *Foundation on Economic Trends,* 610 F.Supp. at 843. Under this standard, whether Plaintiffs have a substantial likelihood of success is judged by whether Plaintiffs have a " 'reasonable probability of success.' " *Albright v. Board of Educ.,* 765 F.Supp. 682, 686 (D.Utah 1991) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen,* 640 F.2d 255, 261 (10th Cir.1981)). However, if the last three balancing factors "tip decidedly" in Plaintiffs' favor, the Tenth Circuit applies a less stringent standard for determining whether a plaintiff has a substantial likelihood of success: " 'plaintiffs need only show a fair ground for litigation.' " *Id.* (quoting *Seneca–Cayuga Tribe v. State of Oklahoma,* 874 F.2d 709, 716 (10th Cir. 1989)).

### B. Balance of Harms

In establishing the need for injunctive relief, the court balances the last three requirements: (1) whether, in the absence of injunctive relief, Plaintiffs are threatened with irreparable injury; (2) whether Plaintiffs' potential injury outweighs any damage to Defendants; and (3) whether an injunction will be adverse to the public interest. *Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir.

1989). Plaintiffs assert three types of irreparable harm: (1) that the ADCs threaten the viability of the coyote population; (2) that they lose enjoyment of recreational land and suffer psychological pain when lethal predator control is occurring; and (3) that the forest supervisors failed to follow NEPA, *see Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989) (agency failure to follow NEPA constitutes irreparable harm). Plaintiffs further contend that the permittees will suffer no further harm until spring because sheep predation ceases during the winter months. Contrariwise, the government asserts a long list of potential harms, including the threat to permittees' economic viability and the danger to wildlife from permittees' self-help efforts.

The court finds that the balance of harms does not "tip decidedly" in favor of Plaintiffs, but rather that it tips in favor of the permittees and the public. Injunctive relief would threaten permittees' interests in three ways. First, although predation loss varies from permittee to permittee, the record reveals a trend toward increased predation loss. This is evidenced by the fact that permittees are experiencing losses in allotments that have never suffered predation before. Second, actual losses to predation are much greater than confirmed losses. Various factors, including terrain and herd movement, make it impossible to assess the actual loss, but the court finds that predation loss is much greater than confirmed losses. Third, increased predation loss, the predominant reason why ranchers leave the sheep business, threatens the economic viability of the permittees.

Further, injunctive relief would not serve the public interest. The ADCA directs the Secretary of Agriculture to "conduct campaigns for the destruction" of animals injurious to agriculture and livestock on the national forest and the public domain. 7 U.S.C. §§ 426 to 426b (1988). By contrast, the State of Utah has protected two predators: (1) cougars and (2) black bears. The state, however, has not protected coyotes, but rather regulates coyotes as a predatory animal. Utah Code Ann. § 4–23–3 (1988).

Coyote regulation extends to federal lands, including national forest land. Utah Code Ann. § 4-23-10 (1988). Because coyotes are a non-protected predatory animal, ranchers suffering predation loss may practice predatory control methods against them. Thus, even if the court were to grant the injunction, the permittees may, by law, exterminate predators in order to protect their livestock. Therefore, injunctive relief could become a two-edged sword cutting against the public interest: first, by restricting the government from achieving its statutory objective; and second, by transferring the authority to conduct predator control to those ill-suited to conduct it, the permittees. This self-help situation would create a substantial risk of irreparable harm to the public interest.

Finally, Plaintiffs will suffer no irreparable injury because, despite its contrary contention, even with the ADC programs, the coyote population will remain viable. Nothing in the record supports Plaintiffs' contention that the ADCs threaten the coyote population. This is not to say that the injuries Plaintiffs assert are not real, but rather that this court finds that the injury is not irreparable. Accordingly, the court finds that the comparative harm weighs in favor of denying Plaintiffs' Motion for Preliminary Injunction. Having failed to establish irreparable harm, Plaintiffs, to prevail on their claim for injunctive relief, must establish with reasonable probability that they would prevail on the merits of its claim. *Albright v. Board of Educ.*, 765 F.Supp. 682, 686 (D.Utah 1991).

### C. Substantial Likelihood of Success on the Merits

■ *1. Do the EAs Violate the APA?*— Plaintiffs argue that the ADCs violate the APA because the forest service did not objectively address the economic damage to the permittees, but rather based its decision on the permittees' self-interested statements. Consequently, Plaintiffs contend that the ADCs violate the APA be-

cause they are not based on relevant factors. The court finds that Plaintiffs' APA arguments are without merit, and therefore, as fully set forth herein, concludes that Plaintiffs do not have a substantial likelihood of success on their APA claims.

■ The APA controls judicial review of final agency decisions. "The standard of review [of NEPA decisions] under the [APA] is whether [the decision] was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *National Law Ctr. v. Department of Veterans Affairs*, 736 F.Supp. 1148, 1152 (D.D.C.1990) (quoting 5 U.S.C. § 706(2)(A) (1988)). Plaintiff notes that a final agency decision is arbitrary or capricious if it is not based on relevant factors or if it has no rational basis. *See State of Oklahoma v. EPA*, 908 F.2d 595, 598–99 (10th Cir.1990), *rev. sub nom. State of Arkansas v. State of Oklahoma*, — U.S. ——, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). The court will, therefore, set aside an agency action that violates the APA in this manner. 5 U.S.C. § 706 (1988). However, "[t]he court should not supplant the agency's findings merely by identifying alternative findings that could be supported" by the record. *State of Arkansas v. State of Oklahoma*, — U.S. ——, ——, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992). "An agency ruling is 'arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). If the agency has considered, but not adopted, an alternative course of action, the agency has not acted in an arbitrary and capricious manner. Further, "[i]t is settled that a court's review of agency action under this standard is confined to the administrative record compiled by the agency." *National Law Ctr.*, 736 F.Supp. at 1152; *see also Village of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992);[4] *Sier-*

---

**4.** Plaintiffs seek to introduce extraneous evidence. The court should not consider material outside the record unless is falls into one of three exceptions: (1) if the material explains

technical information in the record, *see Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159–60 (9th Cir. 1980); (2) if the agency failed to consider relevant evidence, *see id.* at 1160; or (3) if the

*ra Club v. Lujan,* 949 F.2d 362, 368 (10th Cir.1991) (plaintiff has burden of showing agency action was arbitrary and capricious).

Plaintiffs argue that the EAs violate the APA because the respective forest supervisors have not established the need for the ADC program. Each forest supervisor must determine need based on studies conducted concerning that forest. Here, Plaintiffs contend, the forest supervisors have not assessed need beyond the word of the permittees.

Even then, Plaintiffs argue that the supervisors should establish some objective criteria for establishing need. For example, need for predator control might exist when the economic viability of the permittees is threatened by predation or when loss to predation reaches some percentage, such as five percent. Plaintiffs also assert that the ADCs have no rational basis because the need for the ADCs was never studied and is, therefore, uncertain, and because the effectiveness of the ADCs is open to dispute. In response, the government contends that the ADC programs are both necessary and effective.

█ Turning first to the need for the ADCs, the agency need not show that a certain level of damage is occurring before it implements an ADC program. In other words, it is not necessary to establish a criteria, such as economic viability of the permittees or percentage loss of a herd, to justify the need for an ADC. Chapter 2650.3 of the Forest Service Manual establishes a policy of animal damage management "when necessary to accomplish multiple-use objectives." Dixie Administrative Record at 000389 [hereinafter Dixie AR]. This policy allows for control activities in two circumstances: (1) when predators threaten "public health or safety"; and (2) when predators "cause or threaten to cause damage to threatened or endangered animals or plants, other wildlife, permitted livestock, or other resources, on National

Forest System lands or private property." *Id.* "In evaluating the need for and in conducting animal damage management programs", the forest supervisor is instructed to "weigh the social, esthetic [sic], and other values of wildlife along with economic considerations." *Id.* at 000390. Hence, to establish need for an ADC, the forest supervisors need only show that damage from predators is threatened.

In this case, the record indicates that actual predation damage was occurring in both the Dixie and Fishlake National Forests. *See, e.g.,* Range Inspection Notes, Dixie AR at 000517–000536, 000548; Fishlake AR at 100058 (Letter from James A. Winnat of APHIS–ADC to Tobias Martinez, Fishlake Forest Supervisor). Consequently, the need for the ADC program is established. Moreover, the forest supervisors sought public comment and considered the competing social and economic values in evaluating the need for an ADC. *See, e.g.,* Dixie National Forest News, Dixie AR at 000206 to 000289; Fishlake EA, App.H, Fishlake AR at 100080–100087. Therefore, Plaintiffs have failed to show that the ADC was not needed.

Similarly, although disagreement exists concerning the effectiveness of predator control programs, the record establishes a rational basis for effectiveness. *See Marsh v. Oregon Natural Resources Council, Inc.,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (when specialists express differing views, the agency has discretion to rely on the reasonable opinion of its own qualified expert). The supervisors have consulted numerous studies that establish the effectiveness of ADC programs. *See, e.g.,* Fishlake AR, Vol. 1; U.S. Fish and Wildlife Service, *Predator Damage in the West: A Study of Coyote Management,* pp. 61–65, Fishlake AR at 100692–100696, Dixie AR at 548. Further, they have discretion to decide when enough information has been gath-

agency, in bad faith, failed to include information in the record, *see Animal Defense Council v. Hodel,* 840 F.2d 1432 (1988), *modified,* 867 F.2d 1244 (9th Cir.1989). If there are gaps in the record, the court should remand for further

consideration. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). Because the court finds that none of these exceptions apply the court will not consider material outside the record.

ered. *See National Indian Youth Council v. Andrus*, 501 F.Supp. 649, 671 (D.N.M.1980). Accordingly, this court will not second-guess the assessment of the forest supervisors concerning the effectiveness of the ADCs.

Finally, Plaintiffs argue that the ADCs violate the APA because they are contrary to the NFMA. 16 U.S.C. § 1604(i) (1988). Under the NFMA, the Forest Service must act in accordance with the forest plan promulgated for each forest. The respective forest plans permit predator control if needed. Plaintiffs assert that the ADCs violate the forest plans because they contain no objective analysis of the need for predator control. The court, however, has already found that the need for the ADCs was established because of actual and threatened damage to livestock. *Supra* at 643. Therefore, Plaintiffs have failed to show that the ADCs are inconsistent with the respective forest plans or that the programs endanger the diversity of wildlife in the forests.

The record supports the hardiness of the coyote and attributes this hardiness to the coyotes adaptability and rapid reproductive capability. *See, e.g.*, Davison, *The Effect of Exploitation on Some Parameters of Coyote Population*, pp. 110–125, Fishlake AR at 100499–100514, Dixie AR at 543 [hereinafter Davison Study]. To jeopardize the viability of the coyote population, seventy-five percent of that population would have to be eradicated yearly for fifty years. *See* Connolly & Longhurst, *The Effects of Control on Coyote Population*, Fishlake AR at 100588–100623, Dixie AR at 558 [hereinafter Connolly Study]. Under the worst case scenario, the cumulative impact on the coyote population will be no more than a forty percent loss. *Id.* Such losses will not endanger the coyote population. Therefore, the court finds that the ADCs as embodied in the EAs do not violate the APA.

■ *2. Do the EAs Violate NEPA?*— Plaintiffs next argue that the EAs are inadequate and in violation of NEPA. Plaintiffs advance the following NEPA arguments: (1) that the respective supervisors failed to look at the cumulative impact of the ADCs; (2) that the supervisors failed to consider a full range of reasonable alternatives; and (3) in the case of the Fishlake EA, that the forest supervisor did not make an independent analysis, but rather copied the Dixie EA. The government acknowledges its obligation to take a hard look at the problem. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1844, 104 L.Ed.2d 351 (1989). Nevertheless, the court finds Plaintiffs' arguments without merit, and therefore, as fully set forth below, concludes that Plaintiffs do not have a substantial likelihood of success on its NEPA claim.

■ NEPA creates "'a discrete procedural obligation on Government agencies to give written consideration of environmental issues in connection with certain major federal actions.'" *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 641 (5th Cir.1983) (quoting *Aberdeen & Rockfish R.R., Inc. v. SCRAP*, 422 U.S. 289, 319, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975)). Written consideration serves two purposes: (1) it provides decision-makers with a detailed environmental report to aid in the substantive decision of whether to proceed with the project; and (2) it provides the public with information and an opportunity to participate in the decision-making process. *Methow Valley Citizens Council*, 490 U.S. at 349, 109 S.Ct. at 1844. These obligations "require that agencies take a 'hard look' at the environmental consequences before taking a major action. *Id.; see also Baltimore Gas and Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (upholding hard look standard). "The role of the judiciary in such cases is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Save Our Wetlands*, 711 F.2d at 642 (quoting *Baltimore Gas and Elec. Co.*, 462 U.S. at 97–98, 103 S.Ct. at 2252). Thus, in assessing whether an agency has complied with its NEPA obligation, the reviewing court should consider whether the agency

has considered "all reasonable alternatives" to the proposed action, *see All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992), and whether it has assessed the cumulative impact or effects of its proposed action, *see Foundation on Economic Trends v. Weinberger*, 610 F.Supp. 829, 841 (D.D.C.1985); 40 C.F.R. § 1508.8(b) (1991). " 'What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned.' " *All Indian Pueblo Council*, 975 F.2d at 1444 (quoting *Natural Resources Defense Council, Inc. v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972)). "NEPA does not requires agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.' " *Id.* (quoting *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984)).

NEPA requires an agency to consider the cumulative impact of an ADC. 40 CFR § 1508.8(b) (1992); *see also Foundation on Economic Trends v. Weinberger*, 610 F.Supp. 829, 841 (D.D.C.1985) (conducting cumulative impact analysis). Plaintiffs contend that the cumulative impact in the present case should have included a study of how hunting, poaching, mortality, and the ADCs effect the viability of the coyote population. Plaintiffs argue that the EAs are flawed because the supervisors did not gather or consider information concerning the impact of hunting on the coyote population. More specifically, Plaintiffs place in evidence the Utah Furbearer Report which is an annual compilation of losses to hunting of various furbearers including coyotes. Plaintiffs contend that this report was available at the time the EAs were prepared and that the supervisors' failure to consider this data is more than harmless error.

In conducting their cumulative impacts analysis, the supervisors did not ignore any relevant data in the record. The forest supervisors consulted numerous sources concerning the cumulative impact of the ADC proposals on the coyote population. *See, e.g.*, Davison Study; Connolly Study; Fishlake AR at 100550, 100588, 100707;

Fishlake AR, Vol. 1; Dixie AR, Vol. 6. Although the Utah Furbearer Report was available, the fact that the forest supervisors, who did not know of the Furbearer Report, did not consider it, is not fatal under NEPA.

Plaintiffs next contend that the supervisors are required to consider a full range of reasonable alternatives in arriving at a decision, including the reimbursement alternative. *See Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815–16 (9th Cir.1987), *rev. sub nom.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The EAs indicate that such an alternative is too costly and unlawful. *See, e.g.*, Fishlake AR at 100722–100723; Dixie AR at 000311. Plaintiffs, however, argue that the supervisors, at a minimum, should have studied the cost of reimbursement. Further, merely because reimbursement would require legislation, the supervisor must still consider such an alternative. *See Natural Resources Defense Council v. Morton*, 458 F.2d 827, 837 (D.C.Cir.1972).

■ The government contends that the forest supervisors were only required to analyze "all reasonable alternatives." *See All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1444 (10th Cir.1992) (citations omitted). Moreover, "NEPA does not requires agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.' " *Id.* (quoting *City of Aurora v. Hunt*, 749 F.2d 1457, 1467 (10th Cir.1984)). Further, "[a]n agency ruling is 'arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.' " *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). If the agency has considered, but not adopted, an alternative course of action, the agency has not acted in an arbitrary and capricious manner. Clearly, the forest supervisors were aware of and gave limited consideration to the reimbursement alternative. This court

will neither substitute its judgment for the judgment of the forest supervisors, nor will it require heroic efforts by the forest supervisors to analyze an alternative, which the forest supervisors view as unrealistic.

■ Finally, an EA must be based on independent analysis. *See Save Our Wetlands v. Sands*, 711 F.2d 634, 641–43 (5th Cir.1983). Plaintiffs assert that the Fishlake EA violates this requirement because it allegedly copies significant portions of the Dixie EA. Most egregious, in Plaintiffs' view, are the Fishlake EA's discussion of cumulative impacts and reimbursement, which closely track the Dixie EA. The government asserts that it was appropriate for the Fishlake supervisor to consult and rely on the Dixie EA and that, despite this reliance, the Fishlake supervisor took a hard look at the needs of the Fishlake National Forest. The court agrees that the EAs do not violate NEPA. The record indicates that the Fishlake forest supervisor independently considered both the cumulative impacts, *see* Fishlake AR, Vol. 1, and the reimbursement alternative, *see* Fishlake AR at 100722–100723. Much of this information is not duplicated in the Dixie AR. Because the respective forest supervisors did not, in every instance, consult the identical information, this court must find that the Fishlake forest supervisor conducted an independent investigation, even though his investigation reached conclusions similar to those reached by the Dixie forest supervisor.

### III. CONCLUSION

The court denies Plaintiffs' Motion for a Preliminary Injunction. In assessing the requirements for injunctive relief, the court finds that Plaintiffs fail on all points. First, although Plaintiffs allege that the lethal predator control programs harm its interests, Plaintiffs' harm is not irreparable. Further, the potential harm that injunctive relief would cause the permittees and the public- outweighs the potential harm to Plaintiffs. Hence, the balance of harms decidedly favors denial of Plaintiffs' Motion.

Similarly, Plaintiffs have not shown a substantial likelihood of success on the merits. Plaintiffs allege violations of the APA, that the ADCs are neither necessary nor effective, and NEPA, that the forest supervisors, in preparing the EAs did not consider a full range of alternatives and did not consider the cumulative impacts of the ADC program. The administrative record, however, does not support Plaintiffs' contentions.

First, the record shows both the need for the ADCs and also an objective basis for conjecturing that the ADCs would be effective. Further, in preparing the EAs, the forest supervisors considered all reasonable alternatives. The forest supervisors' consideration of an unrealistic alternative, such as reimbursement, need not be heroic, so long as this alternative is given limited analysis. Finally, the court finds that, despite the forest supervisors' failure to consider the Utah Furbearers Report, they have adequately analyzed the cumulative impacts of the ADCs. Therefore, the court, making these findings, denies Plaintiffs' Motion for Preliminary Injunction.

This order supersedes the court's December 29, 1992 order, which requires Defendants to give notice to Plaintiffs thirty days before conducting lethal predator control, and accordingly, obviates the need for further argument on this motion.

IT IS SO ORDERED.