STATE OF SOUTH CAROLINA ex rel., Carroll A. CAMPBELL, Jr., Governor of South Carolina and T. Travis Medlock, Attorney General of South Carolina, Plaintiffs,

v.

Hazel R. O'LEARY, Secretary of Energy, and the United States Department of Energy, Defendants.

Austrian Research Centre Seibersdorf, Delft University of Technology in the Netherlands. Riso National Laboratory of Denmark, and SKB Swedish Nuclear Fuel & Waste Management Company, Intervenors.

Civ. A. No. 3–94–2419–0.

United States District Court,
D. South Carolina,
Columbia Division.

Sept. 13, 1994.

Edwin E. Evans, Cameron B. Littlejohn, Jr., Asst. Atty. Gen., Thomas Travis Medlock, S.C. Atty. General's Office, Kenneth Paul Woodington, Columbia, SC, for State of S.C., T. Travis Medlock.

Mark Roblin Elam, Elizabeth Bartlett Partlow, Francis Carlisle Roberts, Jr., Office of the Governor, Columbia, SC, for Carroll Campbell.

Margaret B. Seymour, Asst. U.S. Atty., Columbia, SC, Charles Findlay, Gregory D. Page, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, for Hazel R. O'Leary, U.S. Dept. of Energy.

Howard A. VanDine, III, James Cranston Gray, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Joseph R. Egan, Egan & Associates, P.C., Washington, DC, for Hahn–Meitner–Institut Berlin, Paul Scherrer Institute of Switzerland.

Karen Aldridge Crawford, James Cranston Gray, Jr., Nelson, Mullins, Riley & Scarborough, Columbia, SC, Joseph R. Egan, John W. Lawrence, Egan & Associates, P.C., Washington, DC, for Austrian Research Centre Seibersdorf, Riso Nat. Laboratory of Denmark, SKB Swedish Nuclear Fuel & Waste Management Co., Delft University of Technology in the Netherlands.

## ORDER

PERRY, District Judge.

This action was filed on September 9, 1994. The plaintiff State of South Carolina is seeking declaratory and injunctive relief under the National Environmental Policy Act (NEPA), 42 U.S.C. 4321–4347. This action arises out of the defendant Department of Energy's "urgent relief" program. In that program, DOE proposes to accept 409 spent nuclear fuel assemblies from various foreign research reactors located in Europe. The State's interest in this matter stems from the fact that the spent fuel will be stored at the Savannah River Site (SRS) until a repository for such material is constructed. Such a repository will not be available for another 15 to 20 years, if indeed it ever opens.

The record discloses that this "urgent relief" program began to manifest itself in or prior to October 1992. By July 1993, the Governor of South Carolina became aware of a proposed shipment to the Savannah River site of about 150 Belgian spent fuel assemblies, and the Governor immediately made his opposition known. Draft Environmental Assessments were issued in October 1993

and February 1994. The defendant in late 1993 obtained the permission of the Council on Environmental Quality to treat the shipment of the 150 Belgian spent fuel assemblies as an "emergency" (not the ones involved in this case) under 40 C.F.R. 1506.11. This had the effect of making an Environmental Impact Statement unnecessary for that shipment. As it developed, however, the Belgian reactor operator sent the 150 assemblies to Scotland for reprocessing.

A final Environmental Assessment (EA) was published in April 1994. Several days later, DOE, relying on this Environmental Assessment, issued a Finding of No Significant Impact, 59 F.R. 22829, reflecting the conclusion of the Department that no additional environmental review of the matter was necessary. As a result, the Department took steps to begin the shipment of the first 153 of the 409 spent fuel assemblies to the United States.

The plaintiffs' contend that (1) the proposed action is a "major Federal action" which "significantly affects the quality of the human environment" within the meaning of NEPA, 42 U.S.C. 4332(2)(C); (2) that an Environmental Impact statement is necessary and (3) that the shipment of the material to this country should be enjoined until such an Environmental Impact statement is completed.

A few hours after this case was filed, a hearing was held, at the request of the plaintiffs, with only short notice provided to the local U.S. Attorney's Office. The Court concluded at that time that a Temporary Restraining Order should issue, restraining the defendants from shipping the material to the United States. By its terms, the order was to expire on September 13, 1994 at 5:00 p.m. A hearing on the plaintiffs' application for a preliminary injunction was set for September 12, 1994, and at that time a four-hour hearing was held.[1] The positions of all parties were argued, and evidence was received in the form of documents and testimony. Having reviewed the evidence and arguments presented by all parties, the Court concludes that for the reasons set forth below, it is appropriate to enter a preliminary injunction restraining the defendants from importing the 409 spent fuel assemblies into this country. The Court further orders that the plaintiff (and other parties if they so choose) shall file a summary judgment motion in an expeditious manner. The precise deadlines for further filings in this case shall be set after the Court confers further with the parties.[2]

The well-known standards in this Circuit for granting preliminary injunctive relief were set forth in *Blackwelder Furn. Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). As recently paraphrased in *Hughes Network Systems v. Interdigital Com. Corp.*, 17 F.3d 691, 693 (4th Cir.1994), the four factors to be considered are as follows:

1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is not granted;

2) the likelihood of harm to the defendant if the preliminary injunction is granted;

3) the likelihood that plaintiff will succeed on the merits; and

4) the public interest.

*Hughes, supra,* points out that these factors are not all weighted equally. Instead, "the 'balance of hardship' reached by comparing the relevant harms to the plaintiff and defendant is the most important consideration, dictating, for example, how strong a likelihood of success showing the plaintiff must make." 17 F.3d at 693. These factors will now be considered in the context of this case.

A. *Likelihood of irreparable harm to the plaintiff.*

There can be little question that if the spent fuel assemblies at issue are permitted to arrive at the Savannah River Site, they will remain there until such time, if ever, as

1. At the hearing, the Court permitted the intervention, without opposition, of the operators of the four reactors whose spent assemblies comprise the material aboard the first two ships.

2. In its Rule 16(b) interrogatory answers, the plaintiffs suggested that they would need the usual 90 to 120 days for discovery. This contention was effectively abandoned when plaintiffs' counsel stated at the hearing that the Plaintiffs could be ready to proceed on summary judgment within a matter of several weeks.

the federal government finally resolves the issue of what to do with spent nuclear fuel and high level nuclear waste. At best, this will be at least fifteen years, and probably will be substantially longer. Denying the preliminary injunction as to the assemblies already in transit will have the practical effect of rendering the case moot as to those assemblies, and consigning the material to South Carolina for many years to come. Issuing a preliminary injunction is the only way to preserve the issue for a ruling on the merits.

■ Nevertheless, the principal issue to be considered in determining whether to grant preliminary injunctive relief in a NEPA case is not so much the potential for substantive environmental harm; instead, the issue is whether NEPA, a procedural statute, has been violated. As United States Court of Appeals for the First Circuit has held, "[i]f [a] decision is made without the information which NEPA seeks to put before the decisionmaker, the harm that NEPA seeks to prevent occurs." *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir.1989). *See also, Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir.1988); *Southern Utah Wilderness Alliance v. Thompson*, 811 F.Supp. 635, 641 (D.Utah 1993); *Coeur D'Alene Lake v. Kiebert*, 790 F.Supp. 998 (D.Idaho 1992). Some cases, such as *Southern Utah, supra,* go so far as to hold that when a NEPA violation is prima facie established, injunctive relief is presumptively available. The balance of hardships must still be considered, but as a practical matter this principle reflects the result usually reached when a plaintiff can establish a reasonable likelihood of success on the merits of a NEPA case. As *Sierra Club v. Marsh, supra,* holds, the potential harm of a NEPA violation is that a project will go forward without the necessary environmental review. Thus in nearly every case, if the plaintiff can show a likelihood of proving that a NEPA violation has occurred, the plaintiff has *ipso facto* shown that irreparable injury will occur. For that reason, the Court concludes that the issue of irreparable

harm to the plaintiff is essentially identical to the issue of whether the plaintiff is likely to prevail on the merits, discussed below.

### B. Likelihood of irreparable harm to the defendant.

■ The defendants and intervenors have argued a number of reasons why the continuation of the injunction until this matter can be heard on its merits will work irreparable harm to them. The Court concludes, however, that the history of this matter indicates the contrary. Furthermore, intervenors assert that if a preliminary injunction is issued, the Departments of Energy, State, Defense, and perhaps others will request the Council for Environmental Quality to deem this matter an "emergency" pursuant to 40 C.F.R. 1506.11, solely because of the presence of the preliminary injunction. If this were to occur, the Council on Environmental Quality could dispense with the need for an Environmental Impact Statement.[3] The fact that this argument was made only by intervenors, rather than by the federal defendants as well, further suggests to the Court that the emergency might not be as great as defendants contend.

The most telling statement in the record is found in the February 1994 Draft EA at p. 4–13. There the Department of Energy asserted that "all of the foreign research reactor operators are fully capable of safely storing this spent fuel, including provision of additional storage if needed, without DOE assistance." On the same page, however, DOE further notes that "many of the reactor operators *do not want* to continue to store this spent fuel and will not do so" (emphasis added). This statement disappeared from the Environmental Assessment as finally issued, although there is no indication that it became incorrect in the interim. It thus appears that the Department of Energy itself has recognized that the spent fuel can be safely stored in place, a fact which militates strongly against the defendants' assertion of an "urgent need" to move the material to

---

**3.** As already noted, the Court feels that the prior history of this matter disproves defendants' contention that dire consequences will occur should an EIS be required. The regulations providing for emergency treatment of some federal actions thus provide defendants with an accessible remedy.

South Carolina. It argues even more strongly that the brief delay necessary to resolve this matter on its merits will not precipitate an emergency for the United States.

In the latter part of 1993, Congress in the Defense Authorization Act, P.L. 103–160, had occasion to consider the specific spent fuel assemblies which are at issue in this action. These were treated in Section 3151 of that Act, 107 Stat. 1547, 1949. The legislative history indicates the view of the committee of Congress which considered this matter was that "the committee does not believe that U.S. origin HEU [high enriched uranium] abroad poses an immediate proliferation risk." 1993 *U.S.Code Cong. and Admin. News* 2013, at p. 2160.[4]

Documents found in the Environmental Assessment and the actions which accompanied them also are revealing. First, the Department knew in 1992 that NEPA compliance could take two years or more. *See* letter of Secretary of State Christopher dated July 2, 1993. A proposal which might take that long (ample time to have completed an EIS) cannot be considered "urgent." Moreover, letters of the State Department and foreign officials dating one to two years ago recognize that actions such as this are not accomplished overnight, but require the resolution of "difficult and complex . . . environmental . . . issues." Letters of Eagleburger and Blix, October 26, 1992 and July 1, 1993. Finally, the Court notes that the Environmental Assessment process was delayed seven months beyond its original target date of September 1993, and even after the Finding of No Significant Impact was issued in April 1994, over four more months elapsed before the first ship actually left Europe.[5]

The balance of equities in this case thus reveals that the potential harm to the plaintiffs are much greater than that which might befall the defendants and the intervenors. If the material enters South Carolina, this case is essentially over as to that material. The chance of the material being exported back to the original reactor locations is infinitesimal. Indeed the case will probably be moot to the extent the material is already in South Carolina. The Plaintiffs will thus host the material for years, and probably for decades, without full NEPA review. On the other hand, requiring the status quo to be preserved for the relatively short time necessary to resolve the merits of this case will pose no threat to safety. And as already noted, Department of Energy has the safety valve of a CEQ-declared emergency which will eliminate the need for further environmental review if conditions so warrant.

### C. Timing.

■ The Court is of course aware that some 153 assemblies have already left Europe and are presently on the high seas. The defendants have sought to ascribe delay to the State in initiating this action.[6] However, it appears to the Court that the situation currently in existence is one which was in the defendants' power to prevent. Although there is some factual dispute as to what transpired between the parties in the last six or seven days, there the record discloses that the defendants were aware very early in September that the plaintiffs proposed to file this action very shortly. There can be little question that the defendants were aware that the filing would be accompanied by a request for injunctive relief; otherwise a suit would not be able to escape mootness. The re-

---

4. This Congressional statement was based on a January 1993 report of the Nuclear Regulatory Commission (NRC) which concluded that "the HEU exported by the United States . . . has been under international safeguards, consistent with applicable unilateral and bilateral agreements."

5. For instance, in ¶ 13 of the Knegt affidavit and ¶ 12 of the Edlow affidavit, it is stated or suggested that the United States could be forced to bear the costs of failure to accept the material. In fact, however, the contracts between DOE and the reactor operators clearly provide that neither party is liable for damages occasioned by, among

other things, "[d]ecisions of judicial bodies." This document is found in the DOE Transportation Plan, August 1994, Appendix 8.1, p. 17.

6. Defendant also contends that the plaintiffs have changed position in this matter, but that argument cannot be sustained. The Governor has consistently stated his opposition to this importation for well over a year. Obviously, the state officials charged with insuring safe transportation of the material needed to continue planning for this importation even though it might have been against the State's wishes.

sponse of the defendants was to initiate negotiations with the plaintiffs for alternative relief short of a lawsuit. The plaintiffs finally issued a deadline of Thursday meantime the second of the two ships set sail from Europe.[7] The plaintiffs were not informed that the second ship had departed Europe until the September 9 hearing or the plaintiffs' application for a temporary restraining order. In any event, the ship departed before any proposal was submitted. Defendants thus appear to have taken unfair advantage of the plaintiffs' good faith openness to negotiate. If the fact that the ships are now underway presents any special problems, those problems were completely within the power of the defendants, or the intervenors, or both, to control, and the outcome of this case should not be affected by the deliberate actions of these parties. Since timing was not an issue of any consequence until the ships left, the defendants' contention that the plaintiffs waited until too late to file this action must be rejected.

### D. Likelihood of success on the merits.

 In determining whether an Environmental Impact Statement is required, the test is whether the proposed action is potentially a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). In this case there can be little question that the project meets that description when viewed as part of the defendants' proposal to import 10,000 to 15,000 spent fuel assemblies. Both the Department of Energy and Congress have not disputed that the proposed importation of 10,000 to 15,000 assemblies constitutes major federal action significantly affecting the environment, and an Environmental Impact Statement is being prepared for that project. Moreover, despite repeated invocations of alleged national security concerns by both the defendants and the intervenors, the courts have recognized that there is no national defense exemption form NEPA. *See, e.g., No GWEN Alliance v. Aldridge,* 855 F.2d 1380, 1384 (9th Cir.1988).

It may be the case, as defendants contend, that the shipment of the initial 409 assemblies is such a major project. This issue need not be resolved, however, because the Court concludes that the shipment of the 409 assemblies has been improperly broken off, or "segmented," from the larger project.

The CEQ regulation on whether to regard a project as one or more than one is found at 40 C.F.R. 1508.25. The regulation lists several types of actions for which a single Environmental Impact Statement must be prepared. Among these are "cumulative actions," defined as actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. 1508.25(a)(2). Clearly, the shipment of the first 409 of as many as 15,000 spent fuel assemblies is a part of the cumulative whole which will need storage space.

Even more directly applicable is the definition of "similar actions." These are defined as those "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." 40 C.F.R. 1508.25(a)(3). In addition to the cumulative nature of the shipments, there is simply no functional difference in the nature of the initial shipment of the 409 assemblies and later shipment of thousands more proposed after an Environmental Impact Statement has been completed for them. Whatever operations are necessary to transport and store the initial shipments will also be necessary for the later shipments. If the later ones warrant study, as the defendant has admitted, then so do the initial ones. As the Fourth Circuit has held, "We are committed to the proposition that when a major federal action is undertaken, no part may be constructed without an EIS." *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039, 1042 (4th Cir.1986). The Second Circuit has noted that "[t]o permit noncomprehensive consideration of a project divisible into smaller parts, each of which

---

7. The Governor's Office was informed several days earlier that the first ship had left one European location, but it was not made clear to him

that this was anything but a move to meet the second ship in some other European port.

taken alone does not have a significant impact but which taken as a whole has cumulative significant impact would provide a clear loophole in NEPA." *City of Rochester v. U.S. Postal Service,* 541 F.2d 967, 972 (2d Cir.1976). Since this project is as a practical matter inseparable from the larger project which admittedly requires an Environmental Impact Statement, the Court concludes that there is a reasonable likelihood that the plaintiff will succeed on the merits.

### E. *The public interest.*

■ Since both the plaintiff and the defendant are government agencies, the public interest has been a major consideration in the Court's consideration of the contentions of each party, and no additional consideration of this issue at length seems warranted. The Court would simply reiterate its view that granting the preliminary injunction serves the public interest because the harm to the plaintiffs from the material entering the State is irreparable, but there is no comparable harm to the defendant or the intervenors from retaining the status quo for the short time necessary to resolve this matter on its merits.

### CONCLUSION

For the reasons set forth above, the Court hereby enjoins the defendants and intervenors, as well as their agents and employees, from allowing the spent fuel assemblies currently at sea to enter the United States until this litigation is resolved on its merits.

Finally, it is ordered that the parties prepare and submit to the Court, within two working days following entry of this Order, proposed scheduling orders for the determination of this case on the merits. If possible, the parties should submit an agreed-upon scheduling order.

IT IS SO ORDERED.